Frederick C. Moser and Doris G. Moser, husband and wife v. Commissioner.
Moser v. Commissioner
Docket Nos. 53143, 60013.
United States Tax Court
T.C. Memo 1959-25; 1959 Tax Ct. Memo LEXIS 221; 18 T.C.M. (CCH) 116; T.C.M. (RIA) 59025; February 11, 1959
Will M. Derig, Esq., * and Lee L. Newman, Esq., for the petitioners. George E. Constable, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income *222 tax and additions to tax under section 294(d) of the Internal Revenue Code of 1939 in the years and in the amounts as follows: Additions
Defi-
to Tax
Year
Docket
ciency
Sec. 294(d)
1951
53143
$3,203.22
$ 512.51
1952
60013
7,657.04
1,225.14
1953
60013
7,241.06
1,158.58
1954
60013
2,548.74
407.80
The issues for decision are: (1) Whether monthly lifetime payments received by the petitioner Frederick C. Moser for prior services under an employment agreement were taxable compensation or gifts; (2) Whether certain payments made by petitioner Frederick C. Moser to purchasers of insurance were illegal rebates of premiums; (3) Whether certain transportation expenses for petitioner Doris G. Moser were incurred for her personal benefit or as ordinary and necessary business expenses of her husband; (4) Whether stock acquired by petitioner Frederick C. Moser in 1938 had become worthless prior to 1946 so that no loss resulted from purported sales in subsequent years or whether, in the alternative, the purported sales were in fact gifts; (5) Whether attorney's fees paid in connection with a Federal tax controversy were deductible in *223 1951, in which year the petitioners used the standard deduction; (6) Whether a theft loss is allowable; (7) Whether purported loans made by petitioners to a corporation were in fact gifts to its sole stockholder or whether, in the alternative, the loans became worthless in 1954; and (8) Whether the petitioners are liable for penalties under section 294(d)(1)(A) and (2) of the 1939 Code. Some of the facts are stipulated and are hereby found as stipulated. Petitioners are husband and wife who filed a joint income tax return for 1951 with the collector of internal revenue, Tacoma, Washington, and joint income tax returns for 1952 to 1954, inclusive, with the director of internal revenue, Tacoma, Washington. Aside from the general facts found above, our findings of fact and opinion on each of the several issues are presented separately below. To the extent that facts found specifically with reference to a particular issue are also material to other issues, such findings are incorporated by this reference in the facts found with respect to such other issues. Issue 1 Findings of Fact The petitioner, Frederick C. Moser (hereinafter referred to as petitioner or as Moser), *224 has been at all times material to this case engaged in business as a life insurance salesman or broker. On January 1, 1908, Moser agreed to become an agent of the New York Life Insurance Company. On August 17, 1910, Moser and New York Life entered into an agreement, effective January 1, 1911, providing in substance that all prior agreements were terminated, that Moser agreed to solicit applications for insurance, and that New York Life agreed to compensate him by commissions exclusive of "Nylic" considerations. Nylic was the name of an organization of employees, the term being composed of the initial letters of the name of the employer company and was also a term descriptive of the legal relation existing between New York Life and its employees who were members of Nylic under which New York Life made periodic payments to them. On August 17, 1910, Moser offered to enter into an agreement with New York Life, effective January 1, 1911, to supplement the agreement referred to above. The offer was accepted September 26, 1910, and the new agreement provided as follows: (a) Moser agreed to solicit business exclusively for New York Life; (b) Moser and New York Life agreed to be bound *225 by the established provisions of Nylic No. 2; and (c) New York Life agreed to allow Moser time credit for Nylic for the three years preceding January 1, 1911. Moser's Nylic arrangement was thus effective January 1, 1908. One of the declared purposes of New York Life in entering into the Nylic relation with its employees was to eliminate costly turnover of insurance agent personnel through the inducement of Nylic payments. Nylic No. 2, by which Moser and New York Life agreed to be bound, provided, in part, as follows: "SENIOR NYLICS "Senior Nylics shall receive so long as they live, provided only they shall not enter the service of any other life insurance company, monthly payments as follows: "The basis of business for incomes for the 6th, 7th,8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 16th, 17th, 18th, 19th and 20th years of continuous Nylic membership will be added together and divided by 15. The sum thus obtained will then be averaged with the amount of new business written and placed under the conditions provided above during that year of service as a Third Degree Nylic in which his production was smallest, after deducting from same the amount of business placed *226 during said smallest year which has lapsed by nonpayment of premium, been canceled, or otherwise terminated up to December 31 of his twentieth Nylic year. His monthly income as a Senior Nylic shall be $0.75 per thousand on the average, or amount, thus obtained." Under the terms of the Nylic arrangement, in order to become a Senior Nylic, an agent was required to work exclusively for New York Life for 20 years and write at least $50,000 of business each year. The Nylic terms also provided that they could be cancelled by New York Life at any time as to future business but not as to past business. "Nylic No. 2 also provided as follows: "VIII. The Company may, at its discretion, where it is convinced that the rules of Nylic in an individual case - because of special conditions or peculiarities surrounding the case - act unfairly upon a member of Nylic, make such exceptions in his behalf to the Nylic rules as it deems advisable. The making of such exceptions shall not thereafter act as a waiver of the rules and conditions of Nylic." Subsequently, Moser and New York Life entered into another agreement, effective January 1, 1928, which provided as follows: (a) All prior agreements *227 were terminated only insofar as new business written after January 1, 1928, was concerned; (b) Moser agreed to solicit applications for insurance on behalf of New York Life; and (c) New York Life agreed to compensate Moser on a revised straight commission basis exclusive of Nylic considerations. The new agreement specifically provided that its execution would in no way alter or affect Moser's Senior Nylic membership previously acquired, subject to all the rules, regulations, and conditions of Nylic No. 2. Effective January 1, 1928, and up to the present time, Moser was a Senior Nylic and New York Life made Nylic payments to Moser in the amount of $354.89 per month or $4,258.68 per year, except for a brief period, not here involved, when Moser assigned the payments. None of these Nylic payments were from a reserve or other fund to which Moser had ever contributed. All the Nylic payments came exclusively from the funds and resources of New York Life. The company considered and treated these payments on its books as compensation and not as gifts. Effective August 22, 1936, Moser was discharged by New York Life. This discharge was caused, at least in part, by a direct violation *228 of company rules by Moser. Subsequent to his discharge and up to the present time, Moser was an independent insurance broker who was not employed by any insurance company. On each return for 1948 through 1950, the petitioners reported Nylic payments of $4,258.68 as taxable income. On each return for 1951 through 1954, the years here involved, the petitioners reported Nylic payments of $4,258.68 as nontaxable. The payments in question were compensation. Opinion The petitioners contend that the Nylic payments made to Moser in the years 1951-1954, inclusive, were in the nature of gifts and, thus, not taxable income. This conclusion apparently is reached by the petitioners in the following fashion: (1) The terms of Nylic No. 2 provided that a member of Nylic would receive Nylic payments only so long as he "not enter the service of any other life insurance company"; (2) Upon his discharge in 1936 by New York Life, Moser did enter the service of other life insurance companies and thus forfeited any enforceable right to Nylic payments; (3) New York Life exercised its discretionary right to make an exception to the Nylic rules and continued the payments to Moser; and (4) The *229 payments were thus purely gratuitous and, being in the nature of gifts, must be excluded from gross income. The respondent contends that the payments in question were compensation and not gifts. We agree with the respondent. The payments were made pursuant to an employment agreement of many years standing. The amount of the payments was computed on the basis of years service and insurance policies written for New York Life. Under these circumstances, the payments in question were obviously in the nature of compensation for personal services. Such evidence as petitioners have presented in support of their contention that the payments were gratuitous is unconvincing. Moser himself testified that at the time of his discharge in 1936 he held a conversation with Seton Lindsay, a vice president of New York Life, at which time Lindsay purportedly stated that New York Life would continue Moser's Senior Nylic payments as a "gratuity." On the other hand, the company at all times treated the payments on its books as compensation and Moser reported the payments as such in the years immediately preceding those here involved. Moreover, on the record before us, the petitioners have not shown *230 that Moser entered the service of other insurance companies so as to work a forfeiture of his right to Nylic payments. By his own testimony, when he left New York Life he acted as an insurance broker and worked for himself, not being identified with or employed by any particular insurance company. In support of their argument, petitioners cite Mutch v. Commissioner, 209 Fed. (2d) 390 (C.A. 3, 1954), reversing Andrew Mutch, a Memorandum Opinion of this Court filed June 19, 1953 [12 TCM 705;], but the facts of that case are utterly different from those before us here and the case is clearly distinguishable. Having found that the payments in question were compensation for personal services, and there being no real evidence that New York Life intended them otherwise, we hold that the payments were includible in the gross income of petitioners in the years 1951 to 1954, inclusive. Issue 2 Findings of Fact In 1951 and 1952, Moser wrote policies of insurance relative to the Gerlinger and Williams families and the Gerlinger Carrier Company, all of Dallas, Oregon. Both families were associated with the latter company. Part of this insurance was a $400,000 *231 corporation life insurance policy sold to the Gerlinger Carrier Company. There were also policies sold with respect to individual members of the families associated with the company. Among these individuals were Victor O. Williams, on whose life Moser sold two $50,000 policies in 1951, and his wife with respect to whom Moser sold a $100,000 policy in the same year. Victor O. Williams was an executive of the Gerlinger Lumber Company and was helpful to Moser in placing the above policies of insurance. In December 1952, Moser paid $3,000 to Williams. At least one purpose of that payment was to reduce the premium cost in order to meet the competition of other insurance companies seeking the same business. In 1951, Moser purchased $1,165.08 of liquor in case lots which he gave to two clients in the Seattle, Washington area. Both clients were, at the time of their receipt of the liquor, substantial policyholders from whom Moser had successfully solicited insurance. None of the liquor in question was consumed personally by petitioners, and the entire amount was delivered directly by the liquor store to the clients. In 1953, Moser sold Murphy Motors, Ltd., a corporation located either *232 in California or Hawaii, a $400,000 policy on the life of its president, Murphy. Because Murphy was a substandard risk there was an excess over the normal premium charge in the amount of $3,600. Moser paid the $3,600 in 1953 out of his own funds for the benefit of Murphy Motors, Ltd. Moser is currently suing to recover the $3,600. The above payments of $3,000 to Williams in 1952, of liquor in the amount of $1,165.08 to other clients in 1951, and of $3,600 for the benefit of Murphy Motors, Ltd., in 1953, were rebates of premiums. Opinion The respondent determined that the payments in question were rebates of insurance premiums by Moser to the insured and that, such rebates being illegal under applicable state law, the payments were not deductible. Such evidence as was offered by the petitioner in this respect was unconvincing and insufficient to overcome the presumption of correctness of the respondent's determination. Indeed, the evidence strongly supports that determination. With respect to the payment of $3,000 to Victor O. Williams, the petitioner apparently claims it to have been a payment for services rendered. However, the only evidence as to these alleged services *233 is Moser's own uncorroborated testimony that Williams was "very helpful" in introducing him to clients in the Dallas, Oregon area. The only policies of insurance sold in that area to which Moser specifically testified related to individuals connected with the Gerlinger Lumber Company of which Williams was an executive. Moreover, Moser himself testified that the payment was necessary to reduce the premium cost in order to meet competition of other insurance companies seeking the same business. Under the circumstances, we believe the respondent's determination to be amply sustained by the record. Petitioner apparently claims that the $1,165.08 expenditure for liquor was an entertainment expense. While it would seem safe to assume that such a large quantity of liquor given to two individuals might ultimately furnish them considerable entertainment, there is no evidence that this was Moser's purpose or that it had any ordinary and necessary relation to the conduct of his business. He testified that both individuals were holders of substantial policies of insurance sold by him but there is no evidence whatsoever that he solicited insurance from them, or sold them any, subsequent to the *234 payment in question. He testified that it was usual in the insurance business to furnish liquor to clients. However, while under some circumstances we might be willing to consider gifts of liquor in modest amounts to clients to be reasonably related to the promotion and maintenance of customer good will, the amounts of liquor involved here are utterly disproportionate to such a purpose. Under the circumstances, the respondent's determination that the $1,165.08 represented a rebate is sustained. With respect to the $3,600 paid by Moser for the benefit of Murphy Motors, Ltd., it was Moser's testimony that this amount represented a loan by him, and we understand that Moser has instituted a lawsuit for recovery of the amount. There is no indication whatsoever on the record as to the claimed basis for the deduction. The petitioners' 1953 return furnishes no such indication. If the payment was in fact a loan as claimed by Moser at the trial, there is no evidence that it became worthless in the year deducted. The fact that Moser has filed suit to recover is persuasive evidence to the contrary. In any event, petitioners have failed completely to establish that the respondent's determination *235 was incorrect. Rebating is illegal in the states of Washington, Oregon, and California and in the Territory of Hawaii. Wash. Rev. Code, sec. 48.30.140 (1951); Ore. Rev. Stat. sec. 736.620 (1953); Cal. Ins. Code Ann. sec. 750 (West 1955); Hawaii Rev. Laws ch. 161, sec. 8513 (1945). Payments which constitute direct violations of state law may not be deducted as ordinary and necessary business expenses. Tank Truck Rentals, Inc., v. Commissioner, 356 U.S. 30 (1958); Boyle, Flagg & Seaman, Inc., 25 T.C. 43 (1955). The respondent's disallowance of these items is sustained. Issue 3 Findings of Fact Petitioners paid and deducted transportation costs of Moser's wife, Doris, during 1951, 1952, and 1953 as follows: 1951
Hawaii $510
1952
Hawaii
510
1953
New York $163
Southern California
141
Boston
178
Miscellaneous
49 $531 The above transportation consisted in each case of round trips between Seattle and the listed destination. During these trips, Doris did not actually sell insurance. However, at times she assisted in entertaining clients and gave Moser some assistance in the preparation of his solicitation *236 of particular clients. She had no training in shorthand or typing although she could type "poorly." She had no insurance training although in the course of a long married life she had picked up considerable insurance information and had examined some books on the subject. Moser was accustomed to prepare elaborate, individualized "briefs" which he would submit to prospective clients, and Doris assisted in their preparation. On occasion, this assistance included looking up information in local libraries. Generally, after Moser had prepared an initial draft of a brief, Doris would read it, make suggestions as to grammar and style, and sometimes proof-read it. Moser was 72 years of age in 1951. The transportation expenses incurred with respect to Doris were for her own personal benefit and were not deductible as ordinary and necessary business expenses. Opinion The record is clear that his wife was of some assistance to Moser in the conduct of his insurance business while on the trips in question. However, there is no convincing evidence that this assistance, to any substantial degree, was greater than a wife, with a reasonable interest in her husband's business affairs, would *237 normally provide. With respect to the entertainment of clients, she did no more than her wifely duty would require. She was not equipped to furnish competent secretarial assistance, and the greater portion of the assistance she did provide was simply in reading and editing briefs prior to their submission. The petitioners maintain that Moser's health was such as to require her attendance during the years in question. However, the evidence in this connection is at best contraditory. Moser was 72 in 1951 and evidently suffered a stroke in 1955. Doris testified that Moser's health had always been uncertain. Granting that possibility, there is evidence that during the years 1951, 1952, and 1953, he made at least short business trips, involving travel away from home, without her. We are satisfied that the petitioners have failed to overcome their burden of proof as to these expenditures and, accordingly, their disallowance by the respondent is sustained. Issue 4 Findings of Fact In 1938, Moser purchased 200,000 shares of Orogrande gold mine stock at 30 cents per share. The 200,000 shares were represented by two certificates numbered 3627 and 3628 for 100,000 shares each. On *238 December 26, 1948, Moser executed a document which provided, in part, as follows: "Mrs. Ruth (D. J.) Moser, 1233 McGilvray Blvd., Seattle. "My dear Ruth: - "For value received from you, namely $1. in hand paid, I hereby sell and vouchsafe unto you an 8000 share equity in certificate for 100,000 shares # 3627 of the Orogrande Frisco Gold Mines Inc." On their 1948 return, petitioners deducted $1,199.50 explained as one-half of the capital loss from the sale of 8,000 shares of Orogrande stock purchased under certificate 3627 at 30 cents per share and sold for a total of $1. On December 26, 1949, Moser executed a document which provided, in part, as follows: "Mrs. D. J. (Ruth) Moser, Seattle, Washington. "Dear Ruth: - "For $1. in hand paid to me by you I hereby sell and vouchsafe unto you an additional 30,000. share equity in certificate 3627 for 100,000. shares in the Orogrande Frisco Gold Mines, Inc. This addition with the 8000 share equity that you bought from me one year ago makes your full equity in said certificate 38000 shares. "Sincerely yours," On their return for 1949, petitioners deducted $4,499.50 explained as one-half of the capital loss on the sale of *239 30,000 shares of Orogrande stock purchased under certificate 3627 at 30 cents per share and sold for a total of $1. On December 26, 1950, Moser executed a document which provided, in part, as follows: "Mrs. D. J. (Ruth) Moser, Seattle, Washington. "My dear Ruth: - "For $1. in hand paid to me by you I hereby sell and vouchsafe unto you 62000 shares in ctf. # 3627 for 100,000. shares in the Orogrande Frisco Gold Mines, Inc. This 62000 shares with the 38000 shares purchased by you in prior years now gives you the total ownership of said certificate 3627 and I hereby tender it to you. "Here is hoping that some day in the future, probably after I am gone, this stock may become of tangible value. "Sincerely," * * *
"Further, for $1. in hand paid to me by you, I hereby sell and vouchsafe unto you, 40,000. shares in ctf. 3628 for 100,000 shares in the Orogrande Frisco Gold Mines, Inc. "Sincerely," On their 1950 return, petitioners deducted $9,299.50 explained as one-half of the capital loss from the sale of 62,000 shares of Orogrande stock purchased under certificate 3627 at 30 cents per share and sold for a total of $1. On the same return, petitioners deducted $5,999.50 *240 as one-half of the capital loss from the sale of 40,000 shares of Orogrande stock purchased under certificate 3628 at 30 cents per share and sold for a total of $1. On December 14, 1951, Moser executed a document which provided, in part, as follows: "Mrs. Ruth (D. J.) MoserSeattle, Washington. "My dear Ruth: - "I hereby acknowledge your payment of $10. in cash in payment of 60000 shares of stock in certificate # 3628 of the Orogrande Frisco Gold Mines, Inc. "In as much as you have previously purchased from me 40000 shares in this same certificate in this same Company, the entire certificate is now yours and I am delivering it to you herewith. "As you have fully understood in the past through my representations and that is true today - this Mining Company is still entact, and you are justified in believing that if the price of gold should be advanced in the future, as many in and out of mining believe will eventually happen, this company could again become a going concern, and in that event this stock could become valuable. "Sincerely yours," On their 1951 return, petitioners deducted $8,995 explained as one-half of the capital loss from the sale of 60,000 shares of *241 Orogrande stock purchased under certificate 3627 at 30 cents per share and sold on December 14, 1951, for a total of $10. On their 1952 and 1953 returns, petitioners deducted the following amounts explained below: Loss on Orogrande stock
Carry over from
1952
1953
1949
$1,000
1950
1,000
1951
1,000
1952
1,000
Carried forward
$1,000
Carried forward
1,000
Carried forward
1,000
Carried forward
1,000 lCurrent year - Ctf. 3629
1,000
Orogrande was incorporated under the laws of Idaho in 1933. On December 1, 1947, its charter was forfeited for failure to file an annual statement and pay corporation license tax. From that date to the present time, it has not filed an annual statement or reinstated its charter. Orogrande ceased operations from 1939 to the present time. During at least a part of this time an individual who was postmaster and local storekeeper watched the property. However, from at least 1948 until the present time, Orogrande had no office and the locations of its books and records was unknown. Orogrande paid no dividends during its existence. The property itself was run down and deteriorating as early as 1941 and 1942. Much *242 of the movable machinery had been removed from the property following the cessation of operations. Such equipment as remained on the property was scrap by 1946 and 1947. Ruth Moser is the wife of Dan Moser, petitioner's nephew. They have a child named Sheryl. A close, friendly, family relation existed between these four parties between 1948 and the present time. Moser's Orogrande stock was worthless prior to 1947. In making the various transfers to Ruth, Moser intended to make a gift to her and her family. Opinion The respondent contends that the Orogrande stock was worthless prior to 1946, thus leaving Moser no basis upon which to establish a deductible loss upon the purported sales to his niece, Ruth, in subsequent years. The burden is on petitioners to establish that the stock had not become worthless as determined by respondent. B. F. Edwards, 39 B.T.A. 735 (1939). If the petitioners had introduced any evidence that the stock had value at the time of its sale, the burden of going forward with the evidence would have shifted to the respondent. B. F. Edwards, supra.However, we are satisfied that the petitioners produced no such evidence. No *243 Orogrande balance sheets were offered which might have indicated even a book value for its assets. Moser's own testimony was that the company's property would take on some value only if the Government permitted an increase in the price of gold at some future time, an event which he did not expect to have occur in his lifetime. At least two of his letters, those of 1950 and 1951, written to Ruth at the time of the transfer of Orogrande stock to her, clearly indicated a belief on his part that the stock had no then present value. Ruth testified with respect to the occasion of one transfer by Moser of Orogrande shares as follows: "He brought them to the house and he said, 'I want you to take these. Maybe when Sheryl is grown up - I don't think that you will ever realize anything from them.' But, he said, he never would, he was sure, but he said, maybe some day if they ever remined the mines, redrill them or whatever they do, sift the dust that had been sifted, but that it might be of some use to her and he was going to give them to me and I said, 'Oh, let's make it legal, I will pay you for them. How much are they worth?' And he said, 'You can give me four dollars for one group.' And *244 I gave him ten dollars for a couple of others. That was the transaction." One witness, Ross R. Brattin, testified as to the condition of the physical plant of the Orogrande property. Brattin was an individual engaged in mining in the vicinity of Orogrande and he frequently passed by the latter's property. His testimony gave the impression of a property in a state of abandoned ruin and leads to the conclusion that from 1942 on there was essentially nothing but scrap on the site. During the years subsequent to 1942, it was his observation that equipment and materials with scrap value were removed. His testimony leads to the further conclusion that the value of such scrap as was permitted to remain would be exceeded by the cost of removal. While the record would make it difficult to fix the exact year in which the property became worthless, it is clear that petitioners have failed to produce any persuasive evidence that the property was not worthless by 1946 as determined by the respondent. In fact, such evidence as this record contains tends to establish that by all reasonable and practical standards the Orogrande stock was worthless well before the first purported sale to Ruth. *245 The respondent's contention that the transfers of stock by Moser was intended by him to be gifts is supported by the evidence and we have found as a fact that such was Moser's intention. His statements to Ruth that the stock was without value at the time of the transfers, his expressed hope that it might assume value at some remote time, perhaps during the lifetime of his grandniece, Sheryl, the close relationship between Moser and the recipients, the purely nominal sales price, and the lack of real bargain in the alleged sale all support the conclusion that the purported sales were intended to be and were, in fact, gifts. Issue 5 Findings of Fact On their returns for 1951 through 1954, the petitioners deducted attorney's fees as follows: 1951
$305.60
1952
250.00
1953
250.00
1954
475.00
On June 5, 1954, Moser paid Lee Newman on account $100, as attorney's fees in a United States tax controversy during 1948, 1949, and 1950. On July 6, 1954, Moser paid the balance of $150 to Newman for the same purpose. On their 1954 return, petitioners deducted the standard deduction of $1,000. Opinion Petitioners have offered no evidence whatsoever with respect *246 to attorney's fees other than the $250 paid Lee Newman in 1954. The respondent disallowed the deduction of such other fees on the basis that the petitioners had failed to substantiate the payments as proper business expenses. In the absence of any evidence to the contrary, the respondent's determination with respect to these other alleged fees is sustained. With respect to the disallowance of the $250 paid to Lee Newman and deducted in 1954, we have found that petitioners used the standard deduction of $1,000 in that year. In Herbert Marshall, 5 T.C. 1032 (1945), we held legal fees in a Federal tax controversy to be deductible as a nonbusiness expense under section 23(a)(2) of the Internal Revenue Code of 1939. Section 23(a)(2) provides that a nonbusiness expense cannot be deducted specifically where the standard deduction is taken. Since the petitioners took the standard deduction in 1954, the attorney's fees paid Lee Newman in the amount of $250 are not deductible. Issue 6 Findings of Fact On their 1951 return, petitioners deducted the following items: Theft -
Opal cuff links - low estimate $100
Diamond ring - low estimate
500 $600 The *247 diamond ring had been given by Moser to his wife, Doris, in 1926 as an engagement ring. It had never been insured. In 1951, Doris discovered the ring was missing four days after the alleged theft. She made a thorough search of her home without discovering the ring. She suspected a new cleaning woman but did not accuse her or demand the return of the ring from her and petitioners never reported the alleged theft to the police. The cleaning woman never returned to work for petitioners but Doris still knows where she lives. Doris did not accuse the cleaning woman as she was afraid of being charged with false arrest. She knew that a friend of hers had been so charged under similar circumstances. The diamond was slightly under two carats in size and Doris considered $600 a modest value for the ring at the time of the theft. However, it was never appraised by a competent jeweler. The diamond ring was stolen from petitioners in 1951. The amount of the deductible loss sustained by the petitioners was $500. Opinion Respondent maintains that the petitioners have not sustained a deductible theft loss where they did not contact the police and made no effort to recover their property *248 from the alleged thief. The burden of proof is on the taxpayer to establish, in the first instance, that the claimed theft in fact occurred, and, in the usual case, the circumstance that the taxpayer reported the loss to the police at the time the loss is alleged to have occurred is a factor which tends to corroborate the existence of the loss. However, whether or not the alleged loss occurred is a question of fact, and we do not consider that the presence or absence of any single factor is necessarily determinative of the issue. In the instant case, having had the opportunity of hearing the witness, Doris Moser, and having observed her obvious sincerity, we are satisfied that her testimony, uncorroborated as it is, is worthy of belief. We accept as credible her explanation of why the petitioners neither contacted the police nor sought recovery directly from the alleged thief. We have found as a fact that the diamond ring, in question, was stolen from the petitioners in 1951. In Helvering v. Owens, 305 U.S. 468 (1939), the Supreme Court held that the measure of the loss by theft, fire, casualty, etc., on property not used in the trade or business or not held for the *249 production of income is the difference between fair market value of the property immediately preceding and immediately after the casualty or theft, but not in excess of the cost or other adjusted basis. Doris testified that at the time of the theft the diamond ring was worth about $600, an estimate which she considered modest. Such a value for a ring containing a diamond slightly under two carats in size seems reasonable. The petitioners introduced no evidence of the original cost of the ring but we consider that a cost of $500 would have been probable under the circumstances and, applying the principle of Cohan v. Commissioner, 39 Fed. (2d) 540 (1930), have determined $500 to be the amount of the loss which the petitioners are entitled to deduct. The petitioners introduced no evidence whatsoever with respect to the alleged theft of the opal cuff links, and the respondent's disallowance of that item is sustained. Issue 7 Findings of Fact On their returns for 1952 through 1954, petitioners claimed the following deductions concerning M & M Gold Mines, Inc.: 1952
1953
1954
Bad debt -
Current year
$1,000
$1,000
Carried forward
1,000
$1,000
Grub stake
700
*250 M & M Gold Mines, Inc., issued stock with a stated value of 10 cents a share to the following parties on the dates indicated: Stockholders
Date Issued
Shares
Moser
12/30/39
630,000
Dan Moser
12/20/39
340,000
W. H. Moeller
3/28/39
10,000
Moser's wife
20,000 No money was paid into the company for the above stock. On June 25, 1947, W. H. Moeller transferred his 340,000 shares to Moser without consideration. On that same date, Moser made a gift of the 340,000 and his original 630,000 shares to Dan Moser, his nephew. During 1952 and 1954, Moser's own funds of $75.72 and $866.81, respectively, were expended on the mining properties owned, and operations conducted, under the name of M & M Gold Mines, Inc. Of the $866.81 expended in 1954, $260 was paid by check from Moser to Dan Moser who expended the funds on the property and operations. The remaining $606.81 was paid by Moser to third parties. Dan Moser was in complete charge of the company and owned substantially all of its stock during the years in question. The expenditures of $75.72 and $866.81 by Moser in 1953 and 1954, respectively, were gifts by Moser to his nephew, Dan. Opinion The respondent *251 disallowed all of the deductions claimed by the petitioners with respect to the M & M Gold Mines, Inc., and set forth above in our findings of fact. Except with respect to the amounts of $75.72 and $866.81 paid by Moser in 1952 and 1954, respectively, the petitioners have offered no evidence whatsoever with respect to the balance of the claimed deductions, and the respondent's disallowance thereof is sustained. Moser claims that the $75.72 and $866.81 were loans which became worthless in 1954. The petitioners have offered no persuasive evidence to substantiate the claim. No books or records of M & M Gold Mines, Inc., were offered. No notes or other evidence of indebtedness were offered. The evidence leads to the conclusion that these payments were paid by Moser, as operating funds were required, in the same manner as his transfer of stock to Dan in 1947, namely, as a gratuity to help out a favorite nephew. Consistent with this conclusion, we have found that the payments in question were gifts and not loans. The petitioners are not entitled to bad debt deductions with respect to these amounts. In view of this decision, it is not necessary for us to decide whether the alleged loans *252 had not become worthless in 1954, as respondent maintains in the alternative. Issue 8 Findings of Fact The petitioners neither filed a declaration nor paid any estimated tax for the years 1951, 1952, 1953, and 1954. On all their returns for 1948 through 1954, the petitioners reported deductions and exemptions in excess of gross income. For the years 1951 through 1954, their returns reported the following gross income and deductions and exemptions: Deductions and
Gross Income
Exemptions
1951
$15,115.88
$17,230.63
1952
21,304.37
22,565.28
1953
22,305.77
36,973.23
1954
10,482.60
16,823.09 The "gross income" shown above for each of those years does not include the $4,258.68 Nylic payment which Moser reported in those years as nontaxable income. The petitioners' returns were based on completely unrealistic deductions and the failure to file declarations of estimated tax in the years 1951-1954 was not due to reasonable cause. Opinion There was no reasonable cause for petitioners' failure to file estimates under section 294(d)(1)(A) of the 1939 Code. Examination of their returns for the years involved shows that the deductions claimed *253 thereon were in large part completely unsubstantiated and unrealistic. For example, their 1953 return contains an item "Cost of business operations all categories in addition to above - $12,750." No breakdown or further explanation was given of the item which was in addition to about $24,000 in other deductions. Again, their 1952 return contained this item, not otherwise explained, "Cost of doing business, estimated 50% of income - $10,652.18." The other returns contain comparable items. Since the petitioners filed no estimates at all during the years 1951-1954, they have made substantial underestimates of tax in those same years within the meaning of section 294(d)(2), and are liable for additions to tax under that section as well as under section 294(d)(1)(A). Decisions will be entered under Rule 50. Footnotes
*. The name "Will M. Derig, Esq.," added by an official order of the Tax Court, dated March 4, 1959 and signed by Judge Train.↩