MICHAEL PENDOLA AND PAULINE PENDOLA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3062–64. Filed June 25, 1968.

*Benjamin Mahler,* for the petitioners.
*William T. Holloran* and *Rudolph J. Korbel,* for the respondent.

FORRESTER, *Judge:* Respondent has determined that the petitioners are liable for the following income tax deficiencies and additions to their taxes:

| Year | Deficiency | Addition to tax, sec. 6653(b), I.R.C. 1954 |
|---|---|---|
| 1961 | $11,138.36 | $5,569.18 |
| 1962 | 28,299.74 | 14,149.87 |

At trial respondent conceded the correctness of the itemized deductions petitioners claimed on their 1961 and 1962 income tax returns. At the conclusion of the trial petitioners filed a motion to dismiss for lack of jurisdiction. The following questions now remain for our consideration: Whether we are without jurisdiction because the statutory notice of deficiency was not sent by the district director of internal revenue for the district where petitioners resided at all relevant times; how much income the petitioners failed to report during 1961 and 1962; whether such failure was due to fraud; whether Pauline Pendola is liable for any additions to the tax which will arise if it is found that the failure to report income was due to fraud.

### FINDINGS OF FACT

## *General*

Michael and Pauline Pendola are husband and wife. Their legal residence at the time of filing the petition herein was Maspeth, Long Island, N.Y. They filed joint individual income tax returns for the years 1961 and 1962 with the district director of internal revenue, Brooklyn, N.Y. Pauline is a party to this litigation with respect to the issues of unreported income and fraud solely because she signed joint returns with her husband Michael. Consequently, we will refer to Michael as the petitioner.

A stipulation of facts was filed, and its contents are incorporated as a finding by this reference. During 1961, 1962, and part of 1963, petitioner was a tax technician (office auditor) working for the Brooklyn district director of internal revenue. While working for the Brooklyn district director, petitioner became involved in a conspiracy to defraud the United States. The conspiracy initiated and employed a system whereby taxpayers were induced to file fraudulent income tax returns, which when accepted gave rise to refunds to which the taxpayers were not entitled. In furtherance of this conspiracy petitioner was responsible for recruiting coworkers within the Brooklyn district director's office to process the fraudulent tax returns in such a manner as to avoid their being audited and discovered by the Internal Revenue Service.

Petitioner and nine other coconspirators were indicted by a Federal grand jury in Brooklyn, N.Y., on or about September 23, 1964. On September 24, 1965, petitioner pleaded guilty to all counts of the indictment.

## *Jurisdiction Issue*

During 1961 and 1962 petitioners filed joint individual income tax returns with the Brooklyn, N.Y., district director of internal revenue.

At all relevant times their residence was within the geographical district under the direction of the Brooklyn district director.

On May 22, 1964, a deficiency notice was mailed to the petitioners by the district director of internal revenue, Manhattan District, New York, asserting deficiencies in tax and additions to the tax for the calendar years 1961 and 1962. The notification was issued on official stationery bearing the heading:

U.S. Treasury Department
Internal Revenue Service
District Director
P.O. Box 3100
New York, N.Y. 10015

and concluded as follows:

Very truly yours,

MORTIMER M. CAPLIN,
*Commissioner*
By (S) CHARLES A. CHURCH,
*District Director*

Charles A. Church was district director of the Manhattan district at the time the statutory notice of deficiency was mailed. He was in charge of investigating the entire conspiracy to defraud the Government which was first discovered in the Manhattan district but which was found to spill over into the Brooklyn district. The investigation revealed that fraudulent returns had been filed in both districts, and it disclosed that employees of the Internal Revenue Service in both districts were conspirators. Because the investigation involved the office of the regional inspector and that of both the Manhattan and Brooklyn district directors, it was decided to consolidate the investigation under the director of the Manhattan district.

Within 90 days after receiving the statutory notice, petitioners filed a petition with this Court seeking a redetermination of the deficiencies of which they had been notified. At trial petitioners filed a motion to dismiss. The motion urges that this Court lacks jurisdiction to hear this case because the deficiency notice is null and void. The notice is alleged to be null and void because it was not issued by the Brooklyn district director of internal revenue but by the Manhattan district director.

### OPINION

#### *Jurisdiction Issue*

The petitioners argue that the Manhattan district director lacked authority to issue a deficiency notice to a resident of the Brooklyn dis-

trict, and that therefore the notice is null and void and we lack jurisdiction. The relevant Code provision, sec. 6212(a),[1] states:

SEC. 6212. NOTICE OF DEFICIENCY.

(a) IN GENERAL.—If the Secretary or his delegate determines that there is a deficiency in respect of any tax imposed by subtitle A or B, he is authorized to send notice of such deficiency to the taxpayer by registered mail.

Section 301.7701–9(b), Proced. and Admin. Regs., provides that if a function is vested by the Code in the Secretary or his delegate, and Treasury regulations approved by the Secretary provide that such function may be performed by the Commissioner or a district director, such provision in the regulations shall constitute a delegation by the Secretary of the authority to perform such function to the designated officer. Accordingly, the authority to send deficiency notices is delegated by section 301.6212–1(a), Proced. and Admin. Regs., which states in pertinent part that:

If a district director * * * determines that there is a deficiency in respect of income * * * tax * * * he is authorized to notify the taxpayer * * * by * * * mail * * * [Emphasis supplied.]

This regulation makes it clear that district directors have the authority to send deficiency notices. There is no provision in the Code or Treasury regulations which limits district directors' authority to send deficiency notices to taxpayers within a particular district.

The petitioner relies upon section 301.7701–10, Proced. and Admin. Regs., which states in pertinent part: "The term 'district director' means the district director of internal revenue for an internal revenue district. * * *" He appears to argue that this definition of the term "district director" limits the authority of a director to the particular district. We do not agree.

The logical place for such a limitation to have appeared would have been section 301.6212–1(a), Proced. and Admin. Regs., however, as we have noted above none appears there. The definition of a district director contained in section 301.7701–10 does no more than state the obvious. It in no way limits the authority of directors to do as was done in the instant case, i.e., coordinate an investigation involving taxpayers in more than one district under one director.

Consider the circumstance of the instant case. There were indications of a widespread conspiracy involving many hundreds of taxpayers residing in two adjoining internal revenue districts. Also suspect were many employees of the Internal Revenue Service in each of these two districts. It was not only practical and expedient for the investigation of this far-ranging scheme to be consolidated under the direction of one of the two district directors, but any other course

---

[1] All Code references are to the Internal Revenue Code of 1954, unless otherwise so stated.

would have been dangerous and perhaps self-defeating. Separate efforts would almost certainly have resulted in costly, timeconsuming duplications of activities. Coordination would have been difficult, and it is likely that taxpayers and employees in one district would have been "tipped off" by happenings in the other, thereby endangering and defeating the revenues and allowing the guilty to go unpunished.

The investigation thus having been properly consolidated under one district director (Manhattan), it would be vain and wholly formalistic for us to require that a statutory notice of deficiency dictated by that investigation be issued by some other district director.

We refuse to dignify form over substance. Recently, in *Ben Perlmutter*, 44 T.C. 382 (1965), affd. 373 F.2d 45 (C.A. 10, 1967), another case involving the authority of the signatory of a statutory notice of deficiency to issue such notices, we said (p. 400) :

It is axiomatic that the intent and purpose of the statutory requirement for the issuance of deficiency notices is to inform the taxpayer that the Commissioner means to assess additional taxes against him, and to provide time for the taxpayer to petition this Court for a redetermination if he is so advised. Here the taxpayers knew, and indeed admitted, that the respondent meant to assess deficiencies in income taxes against them; they received the notices issued in respondent's name and promptly invoked our jurisdiction to redetermine the deficiencies in question. To paraphrase the language of Judge Learned Hand in *Olsen* v. *Helvering*, 88 F.2d 650, 651 (C.A. 2, 1937), affirming a Memorandum Opinion of this Court, their petitions here made it perfectly plain that they were not misled and enjoyed every privilege which a notice formally correct and issued by George Allan would have given them. This being true, we are unwilling to construe even a tax statute in the archaic spirit necessary to defeat these levies; the notices are only to advise the person who is to pay the deficiency that the Commissioner means to assess him; anything that does this unequivocally is good enough.

There the taxpayer was complaining that because the former district director had not formally resigned, the newly appointed district director had no authority to issue deficiency notices. Thus the facts were not identical to the instant case, but we regard the principles involved as indistinguishable.

Further, the petitioner has shown no harm or unfairness resulting from his deficiency notice having been sent by the Manhattan district director (where the investigation of the criminal conspiracy case had been consolidated). The notice fully and fairly set out the Commissioner's contentions, and petitioner acted on it timely by the petition filed herein. *Ben Perlmutter, supra;* also cf. *Commissioner* v. *Oswego Falls Corp.*, 71 F.2d 673 (C.A. 2, 1934), affirming 26 B.T.A. 60 (1932).

Having found that the deficiency notice was properly issued, we turn to the form of the notice itself. In the instant case the notice was regular in all respects; it was sent on behalf of the Commissioner

by a district director, but it was not signed by the district director in the taxpayer's own district. As the respondent points out, it is well established that in order to be valid, a deficiency notice need not be signed at all. *Commissioner* v. *Oswego Falls Corp., supra.* In that case the deficiency notice was unsigned, although it closed as did the one in the instant case with the Commissioner's name at the end of the letter. The court said (p. 677) :

> The objection raised by the taxpayer to the letter is that it is not signed. The statute does not require that it be signed. It requires that a "notice of such deficiency" be sent by the Commissioner. The letter is such notice. As a result of the letter, the taxpayer invoked the jurisdiction of the Board of Tax Appeals to redetermine the tax which the Commissioner had determined against it. Having accepted the notice and having acted pursuant to it, it obtained the delay incident to and granted thereby. It may not now complain. The notice of the determination of the tax might take any form required by the substance of the statute. [Citations omitted.]

We therefore hold that the deficiency notice in the instant case is valid and petitioner's motion to dismiss for lack of jurisdiction is accordingly denied.

Petitioner has cited us to the contents of the Commissioner of Internal Revenue's "Statement of Organization and Functions" which appeared in 32 Fed. Reg. 727 (1967). This statement is not, as petitioner's counsel implies, a Treasury regulation, and compliance with it is not essential to the validity of the deficiency notice. It was not signed by the Secretary, nor was it published in that part of the Register where rules and regulations are announced. In fact it is not even published in the Code of Federal Regulations. The status of this "Statement of Organization and Functions" is similar to the "Statement of Procedural Rules" which is published at 26 C.F.R. sec. 600 (1961 rev.) *et seq.*, but which is also unsigned by the Secretary of the Treasury. In *Luhring* v. *Glotzbach*, 304 F.2d 560 (C.A. 4, 1962), the "Procedural Rules" were held not to have the force and effect of law and compliance with them was held not to be essential to the validity of a notice of deficiency. The court held that they were merely directory and not mandatory. Accord *Philip F. Flynn*, 40 T.C. 770 (1963).

## *Amount of Deficiencies and Fraud Issues*

### FINDINGS OF FACT

During December of 1960, when petitioner was working as an office auditor for the Brooklyn district director, he met John J. Giammalvo, an attorney who was representing taxpayers before the Internal Revenue Service. It was at this point that petitioner began his career in crime. In the course of working with Giammalvo on

audits of his clients' returns, petitioner accepted several bribes of "about twenty-five dollars" each in return for giving Giammalvo's clients "favorable treatment." This income was not reported on his 1960 tax return.

So satisfactory were petitioner's early dealings with Giammalvo that the two of them decided to broaden the scope of their illegal activities. Giammalvo and petitioner knew that it was the procedure of the Internal Revenue Service to classify all returns requesting refunds in excess of $100 into one of two categories: "accepted as filed" or "subject to audit." Those returns which were to be accepted were sorted out, stamped accordingly, bound up in bundles of 100, and sent on for further processing. If a tax return could be surreptitiously inserted into the pile of returns which were to be stamped "accepted," then the taxpayer's refund would automatically be paid.

Most of the returns so inserted after this scheme was initiated contained claims for refunds of between $500 and $750 per return, half of this amount was payable to Giammalvo as his fee. The returns were falsified by claiming nonexistent deductions and by altering the figures on Form W–2 which showed the amount of tax withheld.

Giammalvo had been paying employees of the Manhattan district director to process returns through that office in the manner described above. In the latter part of 1960, after having bribed petitioner on several previous occasions, Giammalvo began paying petitioner at the rate of $100 each to surreptitiously process income tax returns through the Brooklyn district director's office. Payment was made at this rate throughout 1961 and 1962.

Petitioner did not work in the section where returns were classified, but he arranged with Hyman Marks, an employee in the classification section, to have Marks classify returns "accepted as filed." Petitioner agreed to pay Marks half of whatever Giammalvo gave him, however, petitioner intentionally destroyed his books and records, in 1963, and Marks was not called as a witness, therefore we are unable to find how much money, if any, petitioner actually paid Marks in connection with the Giammalvo returns. We do not believe petitioner's estimates of what he allegedly paid Marks.

In the latter part of January 1961 petitioner, Giammalvo, and Marks began their fraudulent processing operation and it continued through 1961, 1962, and part of 1963. During 1962 Frank Guidice was hired to deliver returns from petitioner to Marks, and during the late winter and early spring of that year was given $1,600 by petitioner, half of which amount he paid to Marks, keeping the other half for himself.

In practice Giammalvo did not pay petitioner $100 for every return which the latter slipped through the classification section of the

Brooklyn district director's office during 1961 and 1962. Returns of some of Giammalvo's friends and relatives were processed free of charge and petitioner was not paid for processing these. Other returns for friends of Giammalvo were handled for a nominal fee, of about $10 per return. After eliminating those returns which were processed for Giammalvo's relatives and friends, we find (as more fully explained below) that petitioner received $100 per return for processing no fewer than 299 returns during 1961, and 602 returns during 1962. This income, $29,900 in 1961, and $60,200 in 1962, was not reported on either petitioner's 1961 or 1962 tax returns, and this failure to report was intentional, willful, and done fraudulently with intent to deceive respondent and evade the payment of tax thereon.

Respondent's determination herein assesses additional income of $29,900 in 1961 and $60,200 in 1962. These are the identical amounts which we have now found. Petitioner however had the following additional amounts of unreported income which are relevant to the issue of fraud:

1. The nominal amounts received for handling returns of Giammalvo's friends.

2. During 1961 the petitioner accepted an unspecified number of bribes of varying amounts from a preparer of returns named Rudolph Costa. During that same year petitioner entered into agreements "to expedite" returns containing fraudulent refund claims for a preparer of tax returns named John Santoro, his wife Victoria, and a friend named Anthony Maggio.

As compensation for getting these returns processed without having the fraudulent claims detected, petitioner took half of whatever refund was paid in excess of that to which the taxpayers were legally entitled. Although the precise number of returns which petitioner processed for the Santoros and Maggio is not made clear, it appears that he handled about 15 such returns per year during 1961 and 1962. He was paid between $150 and $200 for each return so processed.

3. During 1962 petitioner arranged to have returns processed for Christopher Fanelli so that they would not be audited. Petitioner was paid 10 percent of the refunds which these taxpayers ultimately received. From his dealings with Fanelli petitioner received a total of about $3,000 during 1962 and 1963 for processing approximately 30 returns.

4. During both 1961 and 1962 petitioner also prepared about 15 tax returns per year for his own friends and relatives. Some of these were "expedited" through the Internal Revenue Service. For this service petitioner received about $10 per return.

*Findings of Fact as to Whether Respondent's Determination Was Arbitrary*

Respondent's determination that petitioner "processed" 299 Giammalvo returns in 1961 and 602 in 1962 was arrived at by the following process. Approximately 1 million returns were first examined. Those which looked suspicious because they had the same doctors listed for medical expense deductions, and other such similarities, were culled out and subjected to office audits. Shortly before the statutory deficiency notice herein was sent on May 22, 1964, 1,368 fraudulent returns had been traced to petitioner for the 3-year period 1961 through 1963. Of these, 235 were filed in 1961, and 475 were filed in 1962. Out of those returns which remained to be audited, it was estimated, based on the experience of the investigation, that an additional 64 returns would be traced to petitioner for 1961, and that an additional 127 returns would be traced to petitioner for 1962. This projection would have made a 3-year total (1961, 1962, and 1963) of 1,750, and although the record does not show how the final figure was broken down, a total of 2,450 fraudulent returns were ultimately traced to the petitioner.

OPINION

*Reasonableness of Determination, Amount of Deficiencies and Fraud Issues*

Having found that we have jurisdiction to decide this case, we first consider the question of fraud, for as to the additions to the tax imposed by section 6653(b), the burden of proof is on the respondent, section 7454, to show by clear and convincing evidence that the petitioner knowingly understated a part of his income with an intent to evade the tax. *M. Rea Gano,* 19 B.T.A. 518, 533; *Estate of William Kahr,* 48 T.C. 929 (1967).

Petitioner Michael Pendola appears to have conceded that he is liable for the additions to the tax which were imposed because his failure to report income was due to fraud. In light of all the facts, there is no basis for his arguing otherwise. His official position assured his familiarity with tax law requirements and his extensive illegal activities and admissions of guilt leave no room for doubt.

Petitioner does dispute the amounts of respondent's determined deficiencies, and argues first that the deficiency notice was arbitrary and capricious, and therefore not entitled to its usual presumption of correctness. The evidence persuades us that the determination was in no way arbitrary or capricious, and we hold that it is entitled to its usual presumption of correctness. Rule 32, Tax Court Rules of Practice.

The amounts of tax stated as due in the deficiency notice for 1961

and 1962 were derived from previously issued jeopardy assessments covering 1961, 1962, and 1963. These jeopardy assessments were made during the course of the investigation of the tax fraud conspiracy of which petitioner was a part. At the time the jeopardy assessments were issued the investigation had not been completed; however, on the basis of what was then known of petitioner's activities, it was calculated that he had processed 1,368 returns through the Brooklyn district director's office (235 in 1961, 475 in 1962, and 658 in 1963) for which he had been paid $100 per return. It was also estimated that the investigation of the remaining suspicious-looking returns would turn up 382 more returns which petitioner had processed, bringing his 3-year total to 1,750 returns. This estimation was made by examining about 1 million returns, culling out suspicious returns, and subjecting each of these to an office audit. At the time the jeopardy assessment was made enough returns had been processed to show about what percent of the returns which had been culled out as being suspicious looking would be attributable to the petitioner's activities. In fact, by the time the investigation was concluded, 2,450 returns were discovered which petitioner had been paid for processing during the 3-year period.

In light of what actually happened, it is clear that, far from being arbitrary and capricious, respondent's estimates at the time of the jeopardy assessment, and shortly thereafter, at the time of his determination herein, were quite conservative.

We hold that the deficiency notice was not arbitrary. It is therefore presumptively correct as to the amount of tax due. *Frank J. Valetti* v. *Commissioner*, 260 F.2d 185 (C.A. 3, 1958), reversing on other grounds 28 T.C. 692 (1957). Petitioner has failed his burden of overcoming this presumption; consequently, we hold that the respondent's determination as to the amount of unreported income which petitioner received during 1961 and 1962 is correct.

The petitioner has attacked respondent's determination on two additional grounds. The first of which is based on the allegation that substantial amounts were paid over to Hyman Marks for his part in getting returns classified "accepted as filed."

At the outset petitioner concedes that such payments would not constitute deductions under the provisions of section 162. *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30 (1958); *Coed Records, Inc.*, 47 T.C. 422 (1967). However, petitioner argues that he had no claim of right to the moneys which were allegedly given to Marks, and that therefore under the doctrine of *North American Oil* v. *Burnet*, 286 U.S. 417 (1932), such amounts ought not to be included in his income. He cites us to cases involving the taxability of moneys received by officers of closely held companies which were subsequently paid

out in commercial bribes and kickbacks.[2] These cases stand for the proposition that amounts received from illegal activities, to which the recipient has no claim of right, are not transformed into taxable income because of their illegal origin. Another such case is *Allen Schiffman*, 47 T.C. 537 (1967), in which an insurance agent gave illegal discounts and rebates to purchasers of insurance. Such rebates and discounts were agreed upon at the time of sale, however, and were therefore held not to have been taxable income to petitioner since he never had a claim of right to them.

In the instant case there has been a failure of proof on this point. Marks was never called to testify yet he was not shown to have been unavailable. If it had been agreed that part of what Giammalvo gave petitioner was to go to Marks, and such amounts had been given to Marks, then the latter should have been called to attest to this fact. Where, as here, a person is shown to have knowledge of a particular issue, then the party who has the burden of proof on that issue should call the person as a witness, and his failure to do so may, and usually will result in an adverse inference being drawn. McCormick, Evidence, sec. 249, p. 534 (1954). Here petitioner's failure to call Marks is a large factor leading to our finding that, contrary to petitioner's testimony, half of all that was received was not paid over to Marks, and that petitioner did not in fact treat a specific portion of the payments in question as Marks' money.

Without a precise showing of how much was paid over to Marks, it is impossible for us to conclude that petitioner was a mere conduit for some portion of the amounts Giammalvo paid him. Rather it appears that petitioner paid Marks whatever was needed to get the job done. The reason a precise showing is necessary in the instant case is that in order to be persuasive in establishing that part of the money petitioner received from Giammalvo was destined for Marks, it is necessary for petitioner to show that he kept track of what was received so that he would know how much Marks was entitled to. Furthermore, if in fact Marks was not an independent contractor, but a partner, then he surely would have insisted on a detailed accounting of what Giammalvo was paying petitioner. Nothing in Giammalvo's testimony indicates that he regarded Marks as a party to his arrangements with petitioner. There is, in fact, a suggestion that petitioner hoped to become a classifier himself and that using Marks was intended to be only a temporary arrangement.

The second ground upon which petitioner attacks the respondent's determination is that it is too large. He alleges that during 1961 and

[2] *Estate of Kalichuk*, T.C. Memo. 1964–336; *Patrick H. Smith*, T.C. Memo. 1964–274; *Lashells' Estate* v. *Commissioner*, 208 F. 2d 430 (1953).

1962 he received a total of no more than $20,000 from all his illegal activities. Specifically he estimates that Giammalvo alone paid him $4,000 in 1961, and $8,000 in 1962. These estimates are based on his assertion that Giammalvo paid him $50 per return; however, we have found that petitioner was paid $100 per return. Even with this adjustment, we do not find petitioner's own self-serving estimates a sufficiently reliable basis upon which to overturn the Commissioner's determination. Had petitioner been desirous of showing that he did not receive as much money as the respondent determined, he could have introduced a balance sheet and constructed his own increase in net worth.

Giammalvo's testimony conflicts with petitioner's as to the amount paid per return, and also suggests that petitioner processed many more returns than he admitted. Furthermore, respondent's calculations did not include any other source of unreported income besides Giammalvo. However, at trial it was proved that petitioner was paid for processing returns for several others who were apparently not connected with Giammalvo. Therefore, it seems that respondent's estimates were conservative.

Respondent's method of computing the number of returns was exhaustively thorough. About 1 million returns were inspected, and out of these all returns which looked as if they had been prepared by the Giammalvo ring were separated and subjected to an office audit. The taxpayers were questioned in order to discover who was responsible for preparing their fraudulent returns. Some taxpayers named Giammalvo directly, others said they gave their returns to a middleman called a steerer. In some instances the taxpayers said that they were told that the steerer would pass the return directly to Giammalvo, in others they were told that the steerer they dealt with passed the return on, but they did not know to whom. The steerers and Giammalvo were also questioned, and in this way the entire network was pieced together. For these reasons, and because the testimony of Giammalvo establishes beyond a shadow of a doubt that Giammalvo used petitioner exclusively for processing returns through the Brooklyn district director's office, we feel that respondent's system of computing the petitioner's unreported income produced reasonably accurate results.

Petitioner also attacks the size of the deficiency asserted against him on the ground that it does not reflect a number of returns which he processed free of charge, or for a very nominal fee. He argues that Giammalvo served many friends and relatives and did not pay petitioner anything for processing these returns. Opposed to this, Agent Moskowitz, who was in charge of the audits of all the taxpayers involved in the fraudulent scheme, testified (and we have found) that

the report upon which the deficiency notice in this case was based did not include any income from returns which were prepared for the friends and relatives of Giammalvo. Moskowitz' testimony, which we believed, was that during the course of the conspiracy investigation the respondent came to know who Giammalvo's friends and relatives were, and that their returns were not counted in deciding how much unreported income petitioner received.

Considering the entire record, we hold that the respondent has proved, clearly and convincingly, that petitioner's failure to report income during 1961 and 1962 was intentional, resulted in underpayment of tax required to be shown on such returns, and that the omissions and underpayments were due to fraud. Therefore, the respondent's determination of additions to the tax based on section 6653(b) for 1961 and 1962 is upheld.

Having established that the respondent's determination was correct in amount, and that the fraud penalty was properly levied, we now come to the final issue in this case: the extent of Pauline Pendola's liability for taxes and penalties incurred because of her signing and filing joint income tax returns with her husband in 1961 and 1962. We have previously found that Michael fraudulently failed to report income on both years' returns. She does not dispute her liability for the tax, but argues that because she had no knowledge that the returns which she signed were fraudulent, she therefore should not be held liable for the additions to the tax which are imposed by the civil fraud provisions of the Code.

This argument is without merit and must be rejected. As we have said on many previous occasions, the language of the Code, section 6013(d)(3), provides for joint and several liability with respect to the tax of a husband and wife who file a joint return. That the joint and several liability extends to the fraud penalties despite the innocence of the wife is well established. *Hazel Stanley*, 45 T.C. 555 (1966), and cases there cited; *Louise M. Scudder*, 48 T.C. 36 (1967), on appeal (C.A. 6, June 5, 1967); *W. L. Kann*, 18 T.C. 1032 (1952), affd. 210 F.2d 247 (C.A. 3, 1953), certiorari denied 347 U.S. 967 (1954); *Myrna S. Howell*, 10 T.C. 859 (1948), affd. 175 F.2d 240 (C.A. 6, 1949).

Pauline argues that our decision in *Marie A. Dolan*, 44 T.C. 420 (1965), cannot be squared with the above line of cases which impose the civil fraud penalty on a wife who, without knowledge of her husband's fraud, signs and files a joint return with him.

In *Dolan* we held, *inter alia*, that an *assessment* against a husband did not bar the respondent from proceeding against the wife (who had filed a joint return) for the entire amount of the deficiency. In reaching this conclusion we decided, for the purposes of applying sec-

tion 6211(a)(1)(B), that a husband and wife who file joint returns were separate taxpayers. Section 6211(a)(1)(B) requires that the amount which would otherwise be a deficiency be reduced by "the amounts previously assessed * * * as a deficiency." We decided that this last-mentioned provision was limited by the requirement that credit for amounts assessed be given only to the taxpayer with respect to whom the computation of a deficiency is being made, and that therefore *assessment* against one spouse (not *satisfaction* of the tax in issue) was not a bar to proceeding against the other.

We are unable to read anything in the rationale of the *Dolan* case which even suggests that such a result as is urged by Pauline could possibly be required. Not only are the factual circumstances and the legal issues clearly distinguishable, but the underlying rationale of the *Dolan* case is that of strict application of the joint and several liability provisions of the Code. The result of our holding in *Dolan* was to allow the Commissioner to proceed against the other spouse for the full amount of the tax. In the instant case our holding that a wife's joint liability extends to the civil fraud penalties is consistent with our prior decision's strict reading of the Code's joint and several liability provisions.

We hold that petitioner Pauline Pendola is individually liable not only for all taxes found due in 1961 and 1962, but that she is also liable for all penalties imposed under section 6653(b) in both years.

Because of respondent's concessions,

*Decision will be entered under Rule 50.*