JAMES ALEX AND BETTY JEAN ALEX, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10458–75.     Filed May 24, 1978.

*Barney B. Shiotani,* for the petitioners.
*Hector C. Perez,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $38,444 in petitioners' Federal income tax for the year 1972. As a result of concessions by the parties, the sole issue is whether rebates and discounts paid by James Alex to purchasers of life insurance policies reduced his commissions and thereby are properly excludable from petitioners' gross income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

James Alex (James or petitioner) and Betty Jean Alex are husband and wife who resided in Los Angeles County, Calif., at the time the petition herein was filed. They filed a joint 1972 Federal income tax return with the District Director of Internal Revenue, Los Angeles, Calif.

During 1972, petitioner was engaged in the business of selling life insurance in the Los Angeles area. He was an agent for the Jefferson National Life Insurance Co. (Jefferson). Under the terms of his contract with Jefferson, petitioner would be paid as commissions a fixed percentage of the first year's premium on each policy sold and lesser percentages of renewal premiums. The policies sold produced commissions of 75 or 90 percent of first-year premiums. In addition, petitioner was entitled to an

office allowance from Jefferson of 20 percent of commissions earned, if certain conditions were satisfied, and a production or persistency bonus of up to 45 percent of first-year premiums. The size of this bonus depended upon the percentage of policies on which the second-year premium was paid within a specified period. The office allowance was paid 15 days following the close of the month in which the commissions were earned; the production bonus was to be paid within 60 days of the close of the calendar year.

Petitioner perceived that, under this compensation schedule, he would be paid an amount in excess of the first year's premiums on every policy sold if he could qualify for the production bonus. He devised two schemes to take advantage of this situation, the "rebate" and the "discount."

In either case, petitioner approached a prospective customer and stated that he could provide a life insurance policy guaranteed to stay in force for 2 years, with no cash outlay required. If the individual was interested, an application would be made. Under the rebate scheme, which was used with policies producing a 90-percent commission, petitioner would issue a check to the client in the amount of the first year's premium, and the client simultaneously gave petitioner a check in like amount payable to Jefferson. Petitioner would then turn the premium check over to Jefferson and would receive his commission, which was immediately deposited. The client was then notified that he could deposit petitioner's check.

The discount scheme was used only in connection with a policy that had a substantial cash value during the first year that the policy was in effect. Petitioner received a commission of 75 percent of the first year's premium on this type of policy. Instead of exchanging checks with the client, petitioner reduced the premium payable on the policy by the sum of the cash value and commission payable to him and submitted the difference (a small percentage of the premium) to Jefferson.

Petitioner exchanged notes with every client in the amount of the first year's premium. Petitioner would collect on his note only if the client died during the first 2 years of the policy. If the beneficiary collected the insurance proceeds, the note of the client would enable petitioner to collect the first year's premium. If Jefferson successfully contested its liability for payment, Jefferson would refund the premium to the insured's estate, and

petitioner was required to refund his commission to Jefferson. In such circumstances, the note of the client would enable petitioner to collect the refunded commission from the estate. The client's note could also be used to show insurance investigators that the client was obligated for the amount of the premium. The note which petitioner furnished the client was designed to protect the latter in the event that the premium was not refunded upon cancellation of the policy and petitioner sought to collect on the client's note which he held. Neither petitioner nor any client ever collected on any of the notes.

In 1972, petitioner sold life insurance policies to 21 individuals. All of these policies were renewed for the subsequent year by borrowing on the policy, or by petitioner paying minimal amounts. With the exception of one payment in the amount of $300, no policyholder made any out-of-pocket payment for this insurance. Petitioner hoped to build up a clientele by selling insurance in this manner.

During 1972, petitioner paid the following amounts incidental to his insurance selling schemes:

(1) $754.40 to Jefferson as premiums;

(2) $88,104.72 to policyholders;[1] and

(3) $9,839.90 to pay off a loan obtained to finance a premium payment.

It is illegal in California to offer as an inducement to purchase insurance any rebate of the premium payable or of the agent's commission on the insurance contract, and the statute so providing is generally enforced. Petitioner was aware that he was conducting his business in an illegal manner.

Petitioner received $129,944.15 in commissions and office allowances for 1972 and he included this amount in his gross receipts for tax purposes. He claimed a deduction as "cost of goods sold and/or operations" in the amount of $98,403 which was described as "Discounted Premiums." In the notice of deficiency, respondent disallowed the deduction for "Discounted Premiums" on the ground that they were not allowed under section 162(c).[2]

---

[1] Included in this is one check in the amount of $63,683 which related to a policy upon which commissions were earned and reported in 1973.

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year at issue.

## OPINION

The single issue for decision is whether the rebate paid or the discount given by petitioner constitutes a downward adjustment to the amount of gross income received, as petitioners now claim by way of an amended petition, or are business expenses deductible under section 162. If the latter is the case, petitioners concede that the deduction is barred by section 162(c).[3]

Prior to the enactment of section 162(c), this Court consistently held that discounts or rebates from the purchase price are generally to be treated as adjustments of that price and are consequently exclusions from gross income. See, e.g., *Schiffman v. Commissioner*, 47 T.C. 537 (1967), and cases collected therein. See also *Pendola v. Commissioner*, 50 T.C. 509, 519 (1968). We have only recently concluded, in a Court-reviewed opinion, that section 162(c) does not change the principle embodied in the previously decided cases. *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977).

In all but one of the decided cases, the arrangements for the discount or rebate were made by the seller directly with the buyer. The exception is *Schiffman v. Commissioner, supra*, which involved dealings between an agent of an insurance company and the purchaser of the insurance, as is the situation herein. While a careful reading of the facts of *Schiffman* shows that the taxpayer agent had such broad authority that he could arguably be considered the seller of the insurance and that therefore that case is distinguishable,[4] we note that our opinion specifically stated that "In our judgment, the issue herein does not turn on whether there was a direct confrontation between the customer and the insurance company or whether the latter

---

[3]Sec. 162 provides in pertinent part:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(c) ILLEGAL BRIBES, KICKBACKS, AND OTHER PAYMENTS.—

\* \* \* \* \* \* \*

(2) OTHER ILLEGAL PAYMENTS.—No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. \* \* \*

[4]Petitioner herein had only authority to "actively solicit applications for insurance, collecting initial premiums in exchange for official receipts furnished by the Company" and to deliver policies issued by the insurance company.

had knowledge of petitioner's clandestine arrangements." See 47 T.C. at 541. Under these circumstances, we do not think it can fairly be said that *Schiffman* can be distinguished on the basis that, in that case, the taxpayer agent was the seller while the petitioner herein was not. See n. 4 *supra*. Moreover, we are concerned over the appropriateness of differentiating among various types of insurance agents in situations such as are involved herein.

After careful consideration, we now think that any claim of exclusion from gross income, based upon an adjustment to the purchase price resulting from a discount or rebate, should at most be available only to the buyer or the seller[5] and that our decision in *Schiffman* is inconsistent with this principle and should be overruled. Any broader application of the exclusionary principle would open the door to wholesale evasion of the purposes of section 162(c). In short, since petitioner cannot be considered as the seller, there can be no selling price to which any adjustment as to him might be applied and, consequently, any tax benefit to which petitioners herein are entitled must be by way of deduction from gross income, which petitioners have conceded is precluded by that section.

In reaching our conclusion that *Schiffman* should be overruled, we have taken into account the fact that there is no clear legislative recognition that the holding in *Schiffman* should be encased in concrete through the enactment of section 162(c). We have also been mindful of the importance of the policy embodied in the doctrine of stare decisis. But we perceive no compelling reasons or considerations for continuing to adhere to *Schiffman's* expansion of our holdings in *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), and *Atzingen-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173 (1961),[6] where, upon further reflection, we consider such expansion unwarranted. See *Helvering v. Hallock*, 309 U.S. 106 (1940).

*Decision will be entered for the respondent.*

Reviewed by the Court.

---

[5]Cf. *Freedom Newspapers, Inc. v. Commissioner*, T.C. Memo. 1977–429.

[6]These holdings were recently reaffirmed in the context of sec. 162(c). See *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977).

WILBUR, *J.*, concurring: Section 162(c)(2) of the Internal Revenue Code, as added by the Tax Reform Act of 1969, and amended by the Revenue Act of 1971, provides in part:

(2) OTHER ILLEGAL PAYMENTS.—No *deduction* shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. * * * [Emphasis added.]

In enacting this provision, Congress was attempting to codify the law relating to the disallowance of deductions involving illegal payments that had been developed in a series of court decisions. In emphasizing that the new provisions dealt only with denial of deductions, Congress made it clear that the circumstances justifying disallowance should be defined by Congress. The Senate Finance Committee stated:

The provision for the denial of the *deduction* for payments in these situations which are deemed to violate public policy is intended to be all inclusive. Public policy, in other circumstances, generally is not sufficiently clearly defined to justify the disallowance of deductions. * * * [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 597; emphasis added.]

Again, in 1971, when Congress broadened the scope of deductions disallowed, this clearly expressed intent of Congress was reaffirmed:

The Committee continues to believe that the determination of when a *deduction* should be denied should remain under the control of Congress. * * * [S. Rept. 92–437 (1971), 1972–1 C.B. 559, 599; emphasis added.]

In neither Act did Congress focus on the issue of what constitutes gross income. However, a series of decisions, beginning with *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), involved covert discounts reducing the actual sale price of merchandise below invoice prices based on minimum prices established by State law. We were asked to determine whether in computing sales receipts includable in gross income, the

invoice price or the actual sale price reflecting the illegal discount was the appropriate bench mark. As we stated in *Atzingen-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173 (1961):

We have concluded on the evidence that the actual prices at which petitioner sold its products were the invoice prices minus the discounts agreed upon between petitioner and its customers. Accordingly, the problem before us is *not whether such discounts are deductible* as "ordinary and necessary" business expenses from gross income in arriving at net income, cf. *Tank Truck Rentals v. Commissioner*, 356 U.S. 30; rather it is whether the discounts must be taken into account in *determining the amount of gross income* chargeable to petitioner in the first instance. Cf. *Lela Sullenger*, 11 T.C. 1076 (1948), acq. 1952–2 C.B. 3. We hold, following *Pittsburgh Milk Co.*, 26 T.C. 707, which involved a virtually identical situation, that *in computing gross income* the amount of petitioner's sales must be based upon its actual prices and not upon the theoretical legal minimum prices. * * * [36 T.C. at 181; emphasis added.]

In the present case, as in the *Pittsburgh Milk Co.* line of cases, we are not concerned with a deduction from gross income; rather we must determine the proper rules for computing gross income on the facts before us. Indeed, if we conclude that petitioner's compensation was includable in his gross income in full, petitioner concedes that section 162(c)(2) precludes a deduction for the payments made, as they were illegal under a California law that was generally enforced.

The facts demonstrate that the compensation petitioner received for his services was includable in gross income. Petitioner was a life insurance agent for Jefferson Life Insurance Co. (Jefferson). The contract with Jefferson for petitioner's service specifically provided:

5. COMPENSATION SCHEDULE—You shall receive, in payment for your services, commissions, fees, and bonuses on first year and renewal premiums computed in accordance with the company's rules and regulations and in accordance with the compensation schedule attached.

Petitioner also received an office allowance from Jefferson based on the commissions he received. Jefferson provided monthly statements tabulating the income petitioner earned for the period involved. Petitioner included the compensation received from Jefferson National for his services in gross income. On his 1972 income tax return, he claimed a Schedule C deduction on the line for cost of goods sold of $98,403, which was

labeled "discounted premiums." The $98,403 deduction consists principally of payments made to individuals who purchased insurance from Jefferson through petitioner. The general procedure was for the client to make out a check to Jefferson for the first year's premium and concurrent therewith petitioner would write out a check to the client for the same (or nearly the same) amount. In two instances, involving a new policy with high first-year cash value, petitioner paid Jefferson the net premiums due after deducting his commissions and the cash value. In 1972 petitioner also paid Jefferson $754 from his personal checking account for premiums on behalf of three policyholders.

Section 61(a) specifically defines gross income to include "Compensation for services, including fees, commissions, and similar items." No complicated statutory exegesis is required to determine that the commissions herein are clearly includable within this language. In *Ostheimer v. United States*, 264 F.2d 789 (3d Cir. 1959), also involving the includability in gross income of commissions received by an insurance agent, the court succinctly explained the horn book law applicable:

in defining "gross income" as broadly as it did in [sec. 61(a)] Congress intended to "tax all gains except those specifically exempted."

The broad sweep of this language [sec. 61(a)] indicates the purpose of Congress to use the *full measure of its taxing power* within those definable categories * * * Hence our construction of the statute should be consonant with that purpose. Technical considerations * * * or the legal paraphernalia which inventive genius may construct * * * should not obscure the basic issue. (Emphasis supplied.)

Where the payment is in return for services rendered * * * such payment is gross income under [sec. 61(a)]. [264 F.2d at 792; fn. refs. omitted.]

In *Williams v. Commissioner*, 64 T.C. 1085, 1088 (1975), a Court-reviewed opinion with no dissents, we summarized *Ostheimer* as follows:

During 1947, 1948, and 1949, the taxpayer conducted a business as a life insurance agent. He had a contract with 11 different life insurance companies under which he was to receive a commission on each life insurance policy he wrote for them. During the tax years involved the taxpayer was the owner and beneficiary of life insurance policies which he had purchased on the lives of his business partner and three of his key employees. In addition, four of his children also owned policies issued on their lives which were paid for by the taxpayer and given to his children. In his joint Federal income tax returns for those years, he did not include in gross income any of the amounts equal to the commissions he received on the policies involved. In the *Ostheimer* case, as in

the present case, the taxpayer contended that the commissions he received on the premiums he paid were simply his "discount," and not income.

The Court of Appeals stated (264 F.2d at 792):

the life insurance companies paid taxpayer commissions on the premiums as compensation for his services in placing the policies involved. The payments were in discharge of the contractual obligation of the insurance companies to pay taxpayer commissions on all premiums paid on policies which he wrote. In other words, the commissions were a "payment in return for services rendered," and as such constituted "gross income."

It is difficult to see how "commissions" on "discounts" must be included in gross income when a partner, your children, or even the salespersons themselves are the purchasers, but may be excluded where a typical customer is involved. If the former is includable, a fortiori, so is the latter. Given the specific statutory language before us and the broad interpretation historically given to section 61 by the courts, it is beyond doubt that the commissions petitioner received were includable in gross income.

Euphemistically labeling petitioner's kickbacks as "rebates" and "discounts" from prices paid for the policies simply will not work. Insurance contracts were being sold by Jefferson. Jefferson assumed all liability under the contract—the liability to make payment in the event of death, the obligation to honor the loan privileges under the contract, the obligation to change beneficiaries, the obligation to surrender the contract for its cash value. The price for the contract sold was determined by the company and its actuaries for whom petitioner worked. Once an insurance contract was sold, Jefferson was obligated on the contract, was entitled to receive the premium, and did receive the premium. Petitioner's compensation was predicated on a certain percentage of the sales price (premiums) for the insurance policy that was sold.

Jefferson was the vendor, not petitioner. Petitioner had no authority to adjust "a specified gross price to an agreed net price" (*Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707, 717 (1956)) for the premiums (purchase price) were established by Jefferson. Petitioner's income was not from net sales (net premiums); rather he received commissions and allowances for his services. He simply kicked back part of his compensation.

The entire purpose of petitioner in making the payments in issue herein was to increase his future renewal commission income by increasing his volume. And to what source did he look to for this recompense? Obviously to Jefferson and the compen-

sation he was entitled to receive from the company for his services. All of the payments were economically feasible only because of the contractual provisions specifying the income Jefferson was required to pay petitioner for his services.

Petitioner's relationship to the company is quite similar to that of a manufacturer's representative. A manufacturer's representative sells a product of the manufacturer or manufacturers that he represents, and receives compensation consisting of a salary and/or commissions, the latter being predicated on the number of products of the manufacturer sold. As in petitioner's case, the compensation received is pursuant to the contractual arrangement the individual has as an agent or employee of the seller. The seller determines the price of the commodity sold, the circumstances under which it will be sold, the terms of payment, and the other conditions of the sale. The seller compensates its agent or representative for negotiating the sale. If the agent agrees to kick back a portion of his compensation to facilitate the sale, regardless of when the agent made this commitment, he nevertheless must include his compensation from the company in gross income. Whether or not he will be entitled to a deduction will depend on the relevant sections of the Internal Revenue Code permitting deductions from gross income to arrive at adjusted gross income and from adjusted gross income to arrive at taxable income.

Additionally, the rule contended for by petitioner has both practical and theoretical deficiencies. Everyone would agree that if petitioner was paid a salary, he must include it in gross income, and section 162(c)(2) would preclude a deduction for the payments. Why should a different rule apply if he is paid a base salary with a bonus commensurate with production, or a base salary and commissions—a not uncommon practice? Assume an individual working for a base of $1,000 per month and commissions, earns an additional $1,000 in commissions in a given month. To facilitate a sale that will put him over an annual quota, qualify him for promotion, establish an "in" with a client, or for other reasons, he kicks back $1,800. Does theoretical consistency permit him to account for the commission compensation above the line and the salary below the line with the vastly different economic consequences contended for? And if so, how is the practical problem of priority resolved—did he kick back

$800 or $1,000 in salary and did he "adjust the invoice price" by $1,000 or $800 of his commissions?[1] Assume an individual is selling a product with a relatively inelastic demand curve for a firm dominating the market, and under the circumstances is salaried with an annual bonus. If he kicks back a part of his salary and/or bonus to make a sale that will move him into management, is he adjusting the sales price?

These problems demonstrate the difficulties of petitioner's position. Indeed petitioner's interpretation would, at the minimum, potentially remove virtually all commission income from the scope of section 162(c)(2). This would be anomalous in the extreme since the kickback of commission income was a significant if not predominant part of the evil Congress perceived in enacting section 162(c)(2).

The asymmetrical treatment of above and below the line illegality is no tribute to judicial logic. It should be narrowly circumscribed. *Schiffman v. Commissioner*, 47 T.C. 537 (1967), is not fairly distinguishable from the facts before us. Neither may it be distinguished from *Ostheimer v. United States*, 264 F.2d 789 (3d Cir. 1959), involving an insurance agent conducting a business with contracts with 11 different companies. See also *Williams v. Commissioner*, 64 T.C. 1085 (1975), and *Moser v. Commissioner*, T.C. Memo. 1959–25. If substance over form has any substance these cases must be treated alike concerning the only issue before us—the computation of gross income. When our decision herein is added to these precedents, *Schiffman* "has been sapped of its vitality to the point of extinction," and the Court is correct in expressly overruling it. "We have an obligation, as Mr. Justice Cardozo once said, to 'gather up the driftwood and leave the waters pure.'" See *Lindeman v. Commissioner*, 60 T.C. 609, 617 (1973) (Judge Tannenwald, concurring).[2]

---

[1]The anomaly of adjusting the sales price not by sales proceeds but by "commissions" comes perilously close to admitting we are dealing with a kickback.

[2]Congress has in both 1969 and 1971 affirmed a desire to handle by statute matters historically handled on a case by case approach. Since Congress has assumed responsibility for the area, it ought to consider applying Mr. Justice Cardozo's admonition to sec. 162(c). The current statute imposes enormous financial penalties varying with the type of business and the taxpayer's marginal rate, frequently spelling financial ruin for an individual who would receive only a small financial penalty under State law. Any correlation between the tax penalty and the State law penalty (if indeed any exists) is purely fortuitous. And often the tax penalty comes as a complete surprise to the taxpayer, so it can hardly affect his conduct one way or the other. Having incurred the specifically prescribed penalty for his violation under the criminal law of the State, he should be allowed to resume life with

DRENNEN, DAWSON, SIMPSON, STERRETT, and WILES, *JJ.*, agree with this concurring opinion.

RAUM, *J.*, dissenting: *Schiffman v. Commissioner*, 47 T.C. 537, was a close case, but I think that it was correctly decided, and that it should not be overruled.

SCOTT, GOFFE, and CHABOT, *JJ.*, agree with this dissenting opinion.

QUEALY, *J.*, dissenting: The majority would gratuitously overrule *Schiffman v. Commissioner*, 47 T.C. 537 (1967),[1] without either party having raised that issue. During the taxable year in question, that case not only represented the opinion of this Court, but had been acquiesced in by the respondent. (1967-2 C.B. 3.) In fact, respondent's acquiescence was not withdrawn until some years later. This Court failed to sustain respondent's change of position in *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977). I fail to see the distinction here.

Section 162(c)(2) in its present form was enacted by section 310 of the Revenue Act of 1971. At that time, the respondent had acquiesced in the *Schiffman* case and in *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956).[2] Respondent's acquiescence in those cases was not withdrawn until respondent decided to seek a reversal of those cases. (Rev. Rul. 77-244, 1977-29 I.R.B. 8.)

In *Max Sobel Wholesale Liquors v. Commissioner, supra,* a majority of this Court reaffirmed its position in the *Pittsburgh Milk* line of cases. This Court said at page 484:

> We must assume that Congress was aware of the decision of this Court in the *Pittsburgh Milk* case. At the time that the legislation was enacted, the respondent had acquiesced in that decision. If Congress had intended to overrule the *Pittsburgh Milk* case, it is only reasonable to expect that the amendment would have been more specific in so doing or that the congressional intent would find expression in the Report of the Finance Committee accompanying the bill. No mention of any such intent is made in the Report of the Finance Committee accompanying the bill. S. Rept. No. 92-437, 92d Cong., 1st Sess. 72-73.

---

a clean start as best as he can. The unexpected financial ruin, attributable to a tax burden wholly unrelated to his net income in an economic sense, is not required by the exigencies of federalism—indeed it is most likely counterproductive. It is tangential at best to the object of collecting taxes on net income and ability to pay, and undermines the self-assessment system.

[1] Acq., 1967-2 C.B. 3, nonacq., 1977-18 I.R.B. 6.

[2] Nonacq., 1959-1 C.B. 6, acq., 1962-2 C.B. 5, nonacq., 1976-33 I.R.B. 6.

Nor am I able to distinguish the *Schiffman* case on the facts. Both there and in the present case, the taxpayer was selling insurance. Such insurance was sold with the agreement that all or a portion of the premium would be "rebated" to the insured. The mechanics of carrying out this agreement does alter the nature of the transaction. If petitioner had not agreed to apply his commission to the payment of the premium, there would have been no sale. The transaction upon which the respondent relies as a basis for taxing the petitioner encompassed as an essential element the understanding that petitioner would, in effect, waive his right to the commission. A taxpayer cannot realize income to the extent that he gives the buyer the money to purchase the product that the taxpayer is selling, regardless of the legality of the transaction.

The decision of the Court in this case, if correct, not only would result in a tax to petitioner on the amount rebated to the insured, but would require that such amount be included in the income of the insured. In the face of the law as it stood when the Congress amended section 162(c)(2) and enacted section 162(c)(3) in section 310(a) of the Revenue Act of 1971 (Pub. L. 92–178, sec. 310(a)), with the *Schiffman* case on the books and acquiesced in by the respondent, I find it difficult to reach that result in the absence of any indication that the Congress intended to overrule that case.

On the contrary, section 310(a) of the Revenue Act of 1971 indicates, at least by implication, that the Congress recognized that a "rebate" of a portion of the price paid by the seller to the purchaser was not within the scope of section 162(c)(2) as amended. In section 162(c)(3), enacted in recognition of the problem faced in the medicare and medicaid programs, the Congress specifically included "rebates." If the respondent's position is correct, this would have been unnecessary.

What we have here is a statute which had been interpreted by the courts so as to exclude from its scope a refund or rebate of a part of the purchase price between the seller and the buyer, regardless of its legality. That was the state of the law when Congress reenacted section 162(c)(2) as part of section 310(a) of the Revenue Act of 1971. As pointed out in *Max Sobel Wholesale Liquors v. Commissioner, supra,* neither the language of the statute nor the reports of the Committees would justify the

inference that the Congress thereby intended to overrule the *Pittsburgh Milk* line of cases.

The respondent also, at least by implication, recognized that the Congress had not overruled the *Pittsburgh Milk* line of cases in the changes which were enacted in section 310(a) of the 1971 Act. In his interpretation of that section, respondent's only example is that of the traditional "kickback" to the ship's captain by the shipyard. Sec. 1.162–18(b)(5), Income Tax Regs. What the majority of the Court would do here is overrule prior law, notwithstanding the failure of the respondent to seek that result in the reenactment of the statute. In fact, respondent waited some 6 years after the 1971 Act before changing his position. (Rev. Rul. 77–244, *supra*.)

GOFFE and CHABOT, *JJ.*, agree with this dissenting opinion.

GOFFE, *J.*, dissenting: I respectfully dissent. The majority gratuitously undertakes to overrule a reported opinion of this Court which respondent has not even requested. Respondent argued only that *Schiffman v. Commissioner*, 47 T.C. 537 (1967), and *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), were distinguishable. Such a practice not only unfairly deprives petitioners of the opportunity to argue the viability of *Schiffman* on which they had every right to rely, the holding of the majority violates the doctrine of stare decisis in overruling *Schiffman* which was itself correct. *Schiffman* was decided over 11 years ago and the Commissioner acquiesced in the decision shortly after it was published. He withdrew his acquiescence only after the trial in the instant case but did not argue at trial or on brief that the Court should reconsider its holding in *Schiffman.* In the intervening 11 years no court has, in any way, criticized our holding in *Schiffman.* Indeed, we have, in numerous cases, relied upon *Schiffman* as valid judicial precedent. *Pendola v. Commissioner*, 50 T.C. 509 (1968); *Diamond v. Commissioner*, 56 T.C. 530 (1971); *Kenner v. Commissioner*, T.C. Memo. 1974–273; *Pierson v. Commissioner*, T.C. Memo. 1976–281; *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977). In the last cited case, *Max Sobel Wholesale Liquors*, a Court-reviewed opinion decided only a scant 4 months ago, we held that *Pittsburgh Milk Co.*, on which we relied in deciding

*Schiffman,* had not been overruled. Not even the dissenting judges in *Max Sobel Wholesale Liquors* suggested that *Pittsburgh Milk Co.* had been overruled.

The doctrine of stare decisis embodies an important social policy representing an element of continuity in law and is rooted in the psychologic need to satisfy reasonable expectations. *Helvering v. Hallock,* 309 U.S. 106, 119 (1940); *Sylvan v. Commissioner,* 65 T.C. 548 (1975). The majority points to no intervening event during the 11 years that this Court and the Commissioner of Internal Revenue considered *Schiffman* to be correct, that should cause us to reexamine *Schiffman.* Indeed, the majority infers that *Schiffman,* conceded by the majority not to be distinguishable from the instant case, would open the door to wholesale evasion of the purposes of section 162(c). No doubt our recent holding in *Max Sobel Wholesale Liquors* will result in avoidance of the applicability of section 162(c) because of our holding that cost of goods sold is not a deduction, but we expressed no such concern nor did the dissenting judges base their opinion on any widespread avoidance of section 162(c).

The majority fails to address itself to the rationale upon which *Schiffman* was based; i.e., that the taxpayer had no claim of right to the money represented by the rebate or kickback. The Court was correct when it stated in *Schiffman,*

> In our judgment, the issue herein does not turn on whether there was a direct confrontation between the customer and the insurance company or whether the latter had knowledge of petitioner's clandestine arrangements. Rather, we think that the fundamental consideration is whether the customer paid or was required to pay such amounts to petitioner, so that it could be said that he received them under a claim of right or turned his back on income to which he was otherwise entitled. * * * [47 T.C. at 541.]

In my view the majority in the instant case incorrectly overrules that test and presumably bases its opinion upon a proposition rejected in *Schiffman;* i.e., an examination of the relationships to see who is the seller of the insurance policies.

The majority fails to focus upon the facts as applied to the taxpayer before the Court. Petitioner had no claim of right to commission income unless and until he was responsible for the issuance of an insurance policy. In order to build up a right to future commissions he constructed transactions with customers which resulted in the issuance of policies of life insurance. By reason of the bargains he struck, however, he had no claim of

right to the commissions; they were dedicated, as part of the overall bargains which he struck, to the payment of premiums. Petitioner was a cash basis taxpayer and the transactions he entered into to sell the life insurance policies did not confer upon him a claim of right to the commission income. The substance of the transactions for the sales of insurance nets no income to petitioners. I would, therefore, hold that the commission income dedicated to the payment of premiums by use of rebates and loans is excludable from petitioner's gross income. He had no right to the income unless he sold the insurance policies but he did not sell the insurance policies without dedication of the commission income to the payment of premiums. I do not condone what petitioner did any more than I condoned the activities involved in *Schiffman* or *Max Sobel Wholesale Liquors,* but I strongly oppose warping the claim of right doctrine in favor of respondent when he didn't ask for it to construct phantom income and a phantom deduction that must be denied under section 162(c). We recognized the distinction between deductions and cost of goods sold in *Max Sobel Wholesale Liquors.* We should not now, because more taxpayers may avoid section 162(c) than we thought when we decided *Schiffman,* strain the claim of right doctrine to overrule a precedent of long standing which was eminently correct.

SCOTT, FAY, IRWIN, QUEALY, and CHABOT, *JJ.,* agree with this dissenting opinion.

CHABOT, *J.,* dissenting: The issue is whether the rebates paid or the discount given by petitioner James Alex (a) may be taken into account as downward adjustments to gross income or (b) are to be taken into account, if at all, only as trade or business expenses under section 162(a). Petitioners concede that section 162(c) bars deduction of the rebates and discounts under section 162(a). I agree with the majority that this case is not fairly distinguishable from *Schiffman v. Commissioner,* 47 T.C. 537 (1967).

Under *Schiffman,* the rebates and discounts would be gross income adjustments—a decision on this issue for petitioners. However, the majority in this case choose to overrule *Schiffman.*

For the following reasons I believe the majority is wrong in overruling *Schiffman:*

(1) The majority's only stated reason for overruling *Schiffman* is insufficient.

(2) The Court's holding in this case is likely to have an impact in many cases unrelated to the majority's only stated reason for overruling *Schiffman.*

(3) *Schiffman* is not properly distinguishable from the line of cases including *Pittsburgh Milk Co. v. Commissioner,* 26 T.C. 707 (1956), and *Atzingen-Whitehouse Dairy, Inc. v. Commissioner,* 36 T.C. 173 (1961), recently affirmed by a majority of this Court.

(4) The overruling of *Schiffman* is not required by cases such as *Ostheimer v. United States,* 264 F.2d 789 (3d Cir. 1959), and *Williams v. Commissioner,* 64 T.C. 1085 (1975).

### 1. *Insufficiency of Stated Reason for Overruling Schiffman*

The only reason set forth in the majority opinion for overruling *Schiffman* is that failure to do so "would open the door to wholesale evasion of the purposes of section 162(c)."

During the taxable years dealt with in *Schiffman* (1961, 1962, 1963), section 162(c) provided that no deduction was allowable under section 162(a) for any payment to a foreign official or employee if the making of the payment would be unlawful under United States law if United States law were applicable. This provision was enacted in 1958 (Pub. L. 85–866). The Tax Reform Act of 1969 (Pub. L. 91–172, 83 Stat. 710) amended section 162(c) to provide, in paragraph (1), that the prohibition of section 162(a) deduction was to apply also to illegal payments to domestic governmental officials and employees. The 1969 Act also added a paragraph (2) to forbid section 162(a) deduction of illegal bribes and kickbacks if the taxpayer is convicted of making the illegal bribes or kickbacks. Paragraph (2) was modified by the Revenue Act of 1971 (Pub. L. 92–178, 85 Stat. 525) to remove the requirement of a criminal conviction.[1] The 1971 Act also added a paragraph (3)[2] to forbid section 162(a)

---

[1] The disallowance provision also was broadened to apply where the sanction may be "loss of license or privilege to engage in a trade or business" as well as where the sanction may be "a criminal penalty."

[2] The 1969 Act added a paragraph (3), to provide a special statute of limitations rule. The 1971 Act deleted that paragraph (3), replacing it with the present provision, described above.

deductions for kickbacks, rebates, or bribes under Medicare and Medicaid.

No showing has been made that *Schiffman* has vitiated the purpose of any part or all of section 162(c) as it was in effect in 1967 (when the *Schiffman* opinion was published), as it was amended in 1969, or as it was further amended in 1971. This is so despite the fact that, for a decade, respondent acquiesced in *Schiffman,* this Court cited and relied on *Schiffman,* and no court criticized *Schiffman.* Surely, if our 1967 decision in *Schiffman* has so much capacity for mischief now, that capacity would have manifested itself in some manner which could be clearly demonstrated to this Court.

## 2. *Pittsburgh Milk and Atzingen-Whitehouse*

The majority draw a line between *Schiffman* and the *Pittsburgh Milk* and *Atzingen-Whitehouse* line of cases. Apart from the reference to section 162(c), the majority opinion does not state why that line should be drawn.

In *Schiffman* (47 T.C. at 541) this Court analyzed "respondent's efforts to distinguish *Atzingen-Whitehouse Dairy, Inc., supra,* and *Pittsburgh Milk Co., supra,*" and concluded that we were not "impressed" with those efforts. The explanation in *Schiffman* of why it should not be distinguished from the *Pittsburgh* Milk and *Atzingen-Whitehouse* line of cases appears to me to be persuasive and need not be set forth at length at this point. The majority opinion does not state why we should reject the explanation in *Schiffman* and I see no reason for doing so.

## 3. *Effect on Other Situations*

Although the majority opinion states its concern with respect to the impact of *Schiffman* on section 162(c), the majority correctly notes that the issue before the Court is as to whether the discount given by petitioner "constitutes a downward adjustment to the amount of gross income received" or is deductible under section 162(a). The distinction between the gross income adjustment route and the business expense deduction route is not affected by the provisions of section 162(c). This distinction applies in many cases which are unrelated

to either the reach or the policy of any of the paragraphs of section 162(c).[3]

The majority do not suggest that their holding in this case is mandated by the statute. The majority do not suggest that their holding must be adopted regardless of the consequences to other taxpayers. Under these circumstances, it seems to be a peculiar exercise of judicial discretion for this Court to overrule *Schiffman* and change the law without considering the effect of this action on other taxpayers. Indeed, this aspect of the case suggests that the appropriate forum for making the particular change in the law which the majority make is the Congress, and not this Court.

### 4. *Distinction Between Schiffman and Ostheimer, etc.*

It has been suggested that petitioners must include the amounts of the discounts and rebates in gross income because in *Ostheimer v. United States*, 264 F.2d 789 (3d Cir. 1959), *Williams v. Commissioner*, 64 T.C. 1085 (1975), and other cases, this Court and other courts required inclusion in full of commissions in gross income where life insurance agents themselves purchased life insurance policies. This issue, also, was faced squarely by this Court in *Schiffman,* where the Court distinguished the *Ostheimer* and *Williams* type of case as follows:

In those cases, it can at least be maintained that the taxpayer did receive something as compensation in connection with his employment, namely, the excess of the fair market value of the item over what he paid for it. By way of contrast, petitioner herein neither realized nor could have realized anything beyond the amount he actually reported as income. [47 T.C. at 542.]

This distinction seemed persuasive in 1967; no reason has been

---

[3]For example, this distinction applies to salespeople who give rebates or discounts which are not illegal. The result of the majority opinion in this case will be that such legal rebates and discounts are to be taken into account, if at all, only by way of trade or business expense deductions and not by way of exclusions from gross income. Since Treasury Department regulations provide that employee trade or business expenses of part-time salesmen cannot be deducted in arriving at adjusted gross income (sec. 1.62–1(b), Income Tax Regs.), it follows that, under those regulations, any such legal deductions can be taken by part-time salespeople only if they itemize their deductions in arriving at taxable income. Less than 25 percent of individual income tax returns itemize deductions. Tax Reduction and Simplification Act of 1977: H. Rept. 95–27 (Part 1) p. 40, 1977–1 C.B. 507; S. Rept. 95–66, p. 50, 1977–1 C.B. 479; H. R.(Conf. Rept.) 95–263, p. 24, 1977–1 C.B. 519. Consequently, the holding of the majority in this case results in potentially increased tax liabilities for what may be substantial numbers of people under circumstances not remotely related to those dealt with in any of the three paragraphs of sec. 162(c).

offered as to why this Court should now reject the analysis we stated in *Schiffman*.

For the reasons discussed above, I would hold that our decision in *Schiffman* continues to represent the law and that the issue presented in this case should be decided in favor of the petitioners.

FAY and GOFFE, *JJ.*, agree with this dissenting opinion.

