BERT KREISBERG, Transferee of assets of BERT KREISBERG & ASSOCIATES, INC., Dissolved, Transferor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. BERT KREISBERG and RITA M. KREISBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kreisberg v. Commissioner
Docket Nos. 1684-78, 1685-78.
United States Tax Court
T.C. Memo 1979-420; 1979 Tax Ct. Memo LEXIS 105; 39 T.C.M. (CCH) 337; T.C.M. (RIA) 79420; October 4, 1979, Filed Norman H. McNeil and Bruce I. Hochman, for the petitioners. Mark Bernsley, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in Federal income tax against petitioners Bert and Rita M. Kreisberg for the calendar year 1973 in the amount *106 of $956,632, and deficiencies in income tax and additions to tax against transferor Bert Kreisberg & Associates, Inc., as follows: Addition to Tax,
I.R.C. 1954,
Taxable Year Ended
Deficiency
Section 6653(a)
September 30, 1972
$376,099
$18,805
September 30, 1973
485,074
The Commissioner further determined that petitioner Bert Kreisberg is liable as transferee of the corporation's assets in the amount of $201,193 for the 1972 and 1973 corporate deficiencies and the 1972 addition to tax. After concessions, the issues remaining for decision are: (1) Whether premium payments made by Bert Kreisberg and the corporate transferor on life insurance policies sold to clients may either be treated as a downward adjustment to gross commission income or allowed as a deduction under section 162, I.R.C. 1954; (2) whether certain premium payments made by the corporate transferor during its winding-up must be treated as additional liquidating dividends to petitioner Bert Kreisberg, and, if so, whether such payments may serve as the basis for both a liquidating dividend and transferee liability; and (3) whether any part of the corporate *107 transferor's underpayment of tax for the taxable year ending September 30, 1972, was due to negligence or intentional disregard of the rules and regulations. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits thereto are incorporated herein by this reference. Petitioners Bert Kreisberg and Rita M. Kreisberg, husband and wife, resided in Woodland Hills, California, at the time their petition in this case was filed. Petitioners timely filed a joint federal income tax return for the year 1973 utilizing the cash basis method of accounting. Rita M. Kreisberg is involved in these proceedings only because she *108 filed a joint return with her husband for the year 1973. Accordingly, petitioner Bert Kreisberg will sometimes hereinafter be referred to as petitioner. Bert Kreisberg & Associates, Inc. (hereinafter "Associates"), timely filed Federal income tax returns for its taxable periods ending September 30, 1972 and September 30, 1973, utilizing the cash basis method of accounting. On May 23, 1973, Associates elected to wind up its affairs and voluntarily dissolve, and on October 12, 1973, a Certificate of Winding Up and Dissolution was filed on behalf of Associates. Petitioner has been engaged in the business of selling life insurance since 1954 as an agent or general agent. He voluntarily ceased selling insurance in March 1974. From October 6, 1971, through May 31, 1973, petitioner's life insurance sales business was carried on through Associates. Petitioner was the sole stockholder of Associates and the only life insurance agent employed by the corporation. Before the corporation was formed, and after June 1, 1973, petitioner operated as a sole proprietor. On October 23, 1970, petitioner executed an Agency Agreement to sell life insurance with Aetna Life & Casualty, Hartford, *109 Connecticut ("Aetna"). [2] Associates entered into a similar written agreement with Aetna on October 29, 1971, and petitioner executed a second Agency Agreement with Aetna in his individual capacity on June 18, 1973. Early in 1971, Kreisberg met Gerald Beller, a general agent for Aetna in the Los Angeles area. In September or October of 1971, petitioner proposed to Beller that he be authorized to sell to his clients $50 to $100 million on Aetna life insurance on a minimum deposit, high cash value contract. A "minimum deposit" policy is one under which the client may borrow the relatively high cash value generated by the *110 contract and apply the cash value towards a part of the premium payment. The remainder of the policy premium, equal to the difference between the cash value of the policy and the full premium, is paid by the client from his own sources of funds. The borrower of the policy cash value is not personally liable to the insurance company for repayment of the loan; the insurer's only security is the life insurance policy itself. Beller arranged for a meeting with the director of Aetna's Life Department in Hartford to discuss petitioner's proposal. The proposal was accepted by Aetna, and a new type of non-participating, [3] minimum deposit, high cash value, level premium life insurance contract was designed with the specific purpose of facilitating petitioner's plan to write all of his business on a minimum deposit basis and in substantial quantities.[4] At the Hartford meeting with Aetna petitioner represented that he, Kreisberg, would see to it that the policies sold by him would remain in force for at least three to four years. The profit that Aetna could expect to earn from petitioner's sales depended in important part on the length of time that the policies remained in force, and, *111 as may be readily ascertained from the amount of expense reimbursements and commissions paid by Aetna, as will appear hereinafter, Aetna would sustain losses on any such policy that was not maintained for at least some some three or four years, wholly apart from actuarial losses and overhead. Petitioner began to sell the new policy in 1971, first as a sole proprietor and, after Associates was formed, through his corporation. From June 1, 1973, through December 31, 1973, petitioner again sold the Aetna policies as a sole proprietor. As will hereinafter be more fully set forth, Associates was engaged in certain Aetna transactions during its winding up period at a time when petitioner's sole proprietorship was also in operation. Both Associates' business and that of the proprietorship consisted essentially of sales of the new life insurance *112 contract to wealthy business and professional clients. Kreisberg offered prospective clients large facevalue policies under an arrangement whereby the client could acquire the insurance coverage with absolutely no cash outlay on his part and at a substantial "discount". The client understood the net annual premium would be about 35 percent less than competitive policy premiums, and the client would incur no obligation other than to provide petitioner with leads to prospective purchasers of life insurance. Thereafter, the client had the option to "renew" the policy in the following year by paying the annual premium. In certain cases, petitioner [5] renewed the policies for a second year with no cash outlay on the part of the client and at about a 20 percent "discount" from premiums on competitive policies. Petitioner's sales method contemplated that he would pay *113 the "discounted" portion of the premium to Aetna on behalf of his clients out of the proceeds of his sales and renewal commissions, plus the proceeds of a so-called expense reimbursement allowance received from Aetna in respect of each new policy sold. [6] Petitioner was able to offer "discounted" insurance with no out-of-pocket cost to the clients for the first year and still earn a substantial profit because the cash value that became available for premium payments, plus the amount of his first year commission and expense reimbursement from Aetna, exceeded the first year premium due on the policy. Thus, if the cash value of the policy were borrowed and utilized to pay part of the premium, petitioner could pay the remainder of the premium (the "net premium due") from his commission income and expense reimbursement allowance and still realize a substantial profit from the transaction. *114 The cash value generated by the Aetna life insurance contract in the first year equalled approximately 65 percent of the first-year premium, and approximately 97 percent of that amount could be borrowed against the policy six months after the policy became effective. [7]The first-year sales commission due Associates (or petitioner individually when he operated as a sole proprietor) was 55 percent of the first annual premium, and Aetna paid out to Associates or petitioner an additional 19.25 percent of the premium (35 percent of the 55 percent commission) in the form of the "expense reimbursement allowance" referred to in fn. 6, supra. The sum of the first-year commission, the expense reimbursement allowance, and the first-year cash value of the policy thus exceeded the first-year premium due on the police. The additional cash value generated by a policy in later years equalled about 80 percent of the renewal premium for any such later year and was available to *115 be borrowed to pay the premium at the time of renewal. [8] After the first year, Aetna paid Associates (or petitioner) a "renewal" commission of 10 percent of the premium. There was no expense reimbursement allowance paid by Aetna in respect of premiums after the first year (i.e., "renewals"). Accordingly, since the sum of the available cash value plus the renewal commission was less than the renewal premium, petitioner would sustain a loss in those instances where he paid the net renewal premium due for the second year of the policy. Such losses sustained by petitioner could be financed out of the profits earned from sales of new policies. It does not appear that petitioner intended to pay any premiums on behalf of an insured after the second year of the policy unless the insured would give him leads to sales of new policies to other persons which would generate sufficient profits in the first year of such new policies to absorb the losses sustained. Petitioner realized that this process could not go on indefinitely. *116 A typical sale of a new policy was transacted by Associates (or petitioner) as follows: Clients who accepted the offer of life insurance without out-of-pocket first-year cost and who qualified financially and physically, executed an assignment of their contractual right to borrow the first-year cash value of the policy (approximately 65 percent of the first-year premium) to Associates or petitioner. The first-year cash value of the policy was unavailable for premium payments for six months. Because of this, Associates or petitioner usually arranged for a commercial bank loan to be used to pay approximately 65 percentof the first-year premium. The bank loan was in the name of Associates or petitioner, and was fully secured by a reassignment of the policy cash value from Associates or petitioner to the bank as collateral. The bank loan would remain outstanding for six months until such time as the available cash value o the policy could be borrowed. The amount of the bank loan, plus interest on the loan for six months, was equal to the amount of cash value that could be borrowed against the policy in six months. Next, the bank would issue its check for the loan proceeds, less *117 its (the bank's) interest charges, payable to Aetna, and Associates or petitioner would remit the balance of the premium owed Aetna (the "net premium due") by check (approximately 35 percent of the first-year premium). [9] On the day of payment of the premium, Aetna remitted, by check to Associates or Kreisberg, 74.25 percent of the first-year annual premium (55 percent commission plus 19.25 percent expense reimbursement). Finally, six months after the policy premium was paid to Aetna, approximately 97 percent of the first-year cash value was available to the holder of the reassignment (the lending institution) and was paid directly to the lending institution as assignee, discharging the loans made to Assiciates or petitioner. [10] At that time the lender would relinquish its right as assignee of the cash value. The net receipt of Associates or petitioner from the sale would *118 be the 55 percent commission and the 19.25 percent expense reimbursement received from Aetna, less the amount of the net premium due paid to Aetna, with certain adjustments for interest incurred on the loans. [11]
*119 When the typical policy sold by petitioner reached its second year, petitioner would in most instances pay the entire second-year premium to Aetna, utilizing for this purpose not only the 80 percent cash value (minus Aetna's interest charges) and his own 10 percent renewal commission, [12] but also enough of his own funds to bring the total up to the full amount of the premium. The insured thus obtained his insurance without cost for the second year, and petitioner sustained a loss in respect of the second-year premium. [13] Apart from some such unusual situation as is described supra, p. 10, petitioner did not plan to pay any premiums beyond the second year. *120 Of the approximately 160 contracts issued in 1972, 95 pecent were renewed in 1973. No client was obliged to pay the net premium due on a renewal. Had the renewal rate (95 percent) dropped considerably, Aetna would not have continued the arrangement. During March 1974, petitioner voluntarily ceased selling insurance. As a result of the transactions herein described, Associate's and petitioner's licenses to engage in the insurance business were revoked on June 15, 1975, by the State of California Department of Insurance on the ground, inter alia, that they had violated Cal. Ins. Code sec. 750 (West 1972). Section 750 of the Insurance Code prohibits any insurance agent from paying, directly or indirectly, any rebate of all or part of the premium on an insurance contract, or any rebate of his commission. The statute is generally enforced. On April 24, 1974, Aetna filed a "Complaint For Damages For Fraud" against petitioner and Associates in the Superior Court of California, County of Los Angeles, in which it charged that it had been defrauded in connection with alleged violations of *121 section 750 of the California Insurance Code by petitioner and Associates. Also, petitioner pleaded nolo contendere to two counts of an indictment for "grand theft" under California law in respect of the same matter involved in the civil suit. The civil suit, as well as a cross-complaint filed therein by the defendants, was thereafter settled by an agreement dated January 4, 1979, calling for dismissal of the complaint and the cross-complaint. The gross receipts of Associates or the proprietorship reported on their respective income tax returns included all of the amounts of commissions received from Aetna (new and renewal) and the amounts received under the expense reimbursement allowance, with the exception of certain adjustments made by the Commissioner and conceded by petitioner. Amounts received from bank loans or from loans of policy cash value were not included as gross receipts in the corporate returns or petitioner's individual returns. On Associates' returns for the taxable years ending September 30, 1972, and September 30, 1973, Associates claimed as a deduction for cost of goods sold or cost of sales $771,547 and $1,191,578, respectively. For the taxable year 1973, *122 petitioner claimed on his individual return cost of sales in the amount of $1,461,098. The amounts reported as cost of sales by Associates and petitioner represent payments to Aetna of the "net premiums due" on new or renewal policies on behalf of clients.No portion of the premium payments derived from bank loans or loans of policy cash value was included in the cost of sales, nor was any deduction for interest paid on the bank or cash value loans claimed by Associates or petitioner. The Commissioner disallowed the cost of sales deductions claimed by Associates [14] and petitioner on the ground that the payments of net premiums due violated section 750 of the California Insurance Code, and therefore were nondeductible pursuant to section 162(c)(2), I.R.C. 1954. On May 23, 1973, Associates elected to wind up its affairs and dissolve, and to distribute all of its assets remaining after discharge of liabilities to petitioner. Between June 19, 1973, and *123 July 28, 1973, Associates made payments by check totaling $172,753.74 for net premiums due Aetna on certain clients' policies and for physicians services. [15] Included in this amount were $101,302.50 in payments made on or after July 12, 1973. As far as the record shows, on July 12, 1973, petitioner commenced to draw checks on his proprietorship account for net premiums due Aetna on clients' policies. The net premium due for one client (Berger) was paid on July 12, 1973, $3,795.08 from Associates' account, and $9,852.92 from the proprietorship's account. The record does not disclose any other instances where premium payments for a client were made in part by the corporation and in part by the proprietorship. Petitioner deposited in his sole proprietorship account the commissions from the policy sales in respect of which Associates made the June 19 through July 28 premium payments. Petitioner had complete freedom to determine to whom Aetna would make the commission checks payable, e.g., petitioner individually, or Associates. *124 In respect of the Aetna policies here at issue, there was a time lag from the date the client was initially solicited to the date the policy was issued and finally to the date the premium was paid for the client. During this time period, the applicant would be required to take a physical examination, and the application would be reviewed by Aetna for acceptance or rejection. After Associates or petitioner got the applicant to sign the application and to take the physical examination, they had the further responsibility of communicating with the applicant's physicians concerning his physical condition, and to follow up on "inspection reports" on the prospective insured. Petitioner reported a liquidating dividend from Associates on his 1973 return in the amount of $28,439. The Commissioner determined that the $172,754 in expenses paid by Associates between June 19, 1973, and July 28, 1973, were paid on behalf of petitioner's sole proprietorship and constituted additional amounts received as a liquidating dividend by petitioner. Associates' deduction of this amount as cost of sales accordingly was disallowed. The Commissioner also determined that the $172,754 additional liquidating *125 dividend represented a transfer of assets rendering Associates insolvent and petitioner liable for Associates' 1972 and 1973 deficiencies and 1972 addition to tax as transferee in the total amount of $201,193 (the $172,754 additional liquidating dividend plus the $28,439 reported liquidating dividend). During its first fiscal year ending September 30, 1972, Associates arranged to have $52,736.23 of its commissions and expense reimbursement allowances from Aetna paid directly to the Security Pacific Bank ("Security"). Of this amount, $15,140.20 was paid by checks dated in 1971, and the remaining $37,596.03 by checks dated in 1972. Petitioners have conceded that Associates failed to report the $52,736 [16] paid to Security as income in its return for the taxable year ending September 30, 1972. Prior to incorporation, petitioner used this procedure of having income paid directly to Security in order to repay business loans to him made by the bank. Petitioner engaged a certified public accountant, Gunnar Gluckman, to install the corporate records of Associates and to prepare corporate *126 and individual returns. The record-keeping system was installed in late 1971 and a bookkeeper hired. Gross receipts were accounted for by recording all cash received by Associates (commissions and expense reimbursements) in a cash receipts journal. The accountant did not use or refer to any commission statements from Aetna in calculating gross income, but he did reconcile the cash receipts journal with the corporation's bank deposits. The $52,736 omitted income was missed by the accountant because the money was never directly received by Associates nor reflected in Associates' bank deposits. Aetna furnished Associates an information return (form 1099) for commissions paid during the calendar year 1971. The form 1099 stated that Associates had received $33,464.32 of commissions in 1971. Petitioner advised his accountant that the form 1099 commissions reflected his individual income. In reliance on petitionerhs representation, the accountant reported these commissions on petitionerhs individual return. The commissions reported on petitionerhs individual return for 1971 include $15,140.20 of Associates' corporate income that was paid directly to Security in 1971. However, none *127 of the $37,596.03 of Associates' corporate income paid directly to Security in 1972 was reported on petitioner's 1972 individual return. A form 1099 for the year 1972 was not provided to the accountant. Petitioner informed his accountant in some detail about his business operations but failed to tell him that some of the corporation's income was being sent directly to Security. Petitioner was aware that the corporation's gross income would be computed primarily by reference to actual cash receipts reflected in the cash receipts journal. The accountant was not provided with commission statements that could have been used to verify the amounts in the cash receipts journal. Petitioner did not keep such statements. The Commissioner determined that part of the underpayment of tax by Associates for the taxable year ending September 30, 1972, was due to negligence or intentional disregard of the rules and regulations, and he asserted the addition to tax provided by section 6653(a) for that year. OPINION 1. Deductibility of Net Premiums Due Paid by Associates or Petitioner. The Commissioner disallowed the "cost of sales" deductions claimed by Associates or petitioner for *128 their payments of "net premiums due" pursuant to section 162(c)(2), I.R.S. 1954. [17]Section 162(c)(2) expressly forbids the deduction of any bribe, kickback, or other payment illegal under a generally enforced state law which subjects the payor to a criminal penalty or loss of license or privilege to engage in a trade or business. By its terms, section 162(c)(2) applies only to items that would be deductions from gross income. We hold that the disallowance under section 162(c)(2) must be sustained. *129 Petitioners first contend that section 162(c)(2) is inapplicable to the net premium payments here at issue because the payments are reductions of Associates' or petitioner's gross income, analogous to either a downward adjustment of the selling price or to cost of goods sold, rather than deductions from gross income subject to section 162(c)(2). The Commissioner, on the other hand, argues that the illegal premium payments must be viewed as deductions falling within the ambit of section 162(c)(2). We agree with the Commissioner. In Alex v. Commissioner, 70 T.C. 322 (1978), on appeal (9th Cir. Aug. 25, 1978), we considered the tax treatment of payments of net premiums due by a California life insurance agent whose sales method was almost identical to that used by petitioner. The taxpayer in Alex approached prospective customers and stated that he could provide a life insurance policy that would remain in force for two years, with no cash outlay required by the customer. For policies with a substantial cash value in the first year, the agent received a commission of 75 percent of the first-year premium. If such a high cash value policy were purchased *130 by a client, the agent "reduced the premium payable on the policy by the sum of the cash value and commission payable to him and submitted the difference (a small percentage of the premium) to [the insurance company]". Alex v. Commissioner, supra, 70 T.C. at 323.Although the agent realized an initial loss on such a transaction, he could qualify for certain production bonuses or office allowances that would enable him to recoup the initial loss and to earn a net profit from the sale. Alex v. Commissioner, supra, 70 T.C. at 322-323. The Commissioner disallowed the deductions claimed for the agent's premium payments under section 162(c)(2), and the Court upheld the Commissioner. Alex specifically rejected the argument that the rebate or discount given by the agent was a downward reduction of the agent's gross income to which section 162(c)(2) does not apply, rather than a deduction from gross income. The opinion noted that when a discount or rebate qualifies as an adjustment to the purchase price or as cost of goods sold, the discount or rebate *131 is an exclusion (not a deduction) from gross income that is not governed by section 162(c)(2). See Max Sobel Wholesale Liquors v. Commissioner, 69 T.C. 477 (1977), on appeal (9th Cir., June 14, 1978).However, Alex held that the "adjustment to the purchase price" argument should at most be available only to the buyer or seller, and that the insurance agent in Alex was not the seller of the insurance. 70 T.C. at 326. In so holding, Alex expressly overruled Schiffman v. Commissioner, 47 T.C. 537 (1967), a case which permitted an insurance agent who made illegal premium discounts or rebates to treat such payments as reductions of gross income (reductions of the purchase price of insurance) and not as deductions. The Court in Alex refused to distinguish Schiffman based on the fact that the agent in Schiffman had such broad authority vis-a-vis the insurance company concerning policy sales that he arguably could be considered the "seller" of the insurance (70 T.C. sat 325-326): While a careful reading of the facts of Schiffman shows that the taxpayer agent had such broad authority that he could arguably be *132 considered the seller of the insurance and that therefore that case is distinguishable, we note that our opinion specifically stated that "In our judgment, the issue herein does not turn on whether there was a direct confrontation between the customer and the insurance company or whether the latter had knowledge of petitioner's clandestine arrangements." See 47 T.C. at 541. Under these circumstances, we do not think it can fairly be said that Schiffman can be distinguished on the basis that, in that case, the taxpayer agent was the seller while the petitioner herein was not. * * * Moreover, we are concerned over the appropriateness of differentiating among various types of insurance agents in situations such as are involved herein. (Footnote omitted.) The instant case is controlled by Alex. The selling schemes employed in Alex and in this case both involved illegal payments of net premiums on high cash value life insurance contracts out of the agents' commissions and allowances from the insurance company. Associates' and petitioner's claim to be the "seller" of the insurance within the meaning of Alex is no stronger here than in Alex. Although *133 there are suggestions in the record that the Aetna policies were specially designed with petitioner's type of operation in mind, and that an official of Aetna may have colluded with petitioner, such factors are legally insufficient to make Associates or petitioner, rather than Aetna, the "seller" of the policies.Alex refused to differentiate between various types of insurance agents based upon their degree of authority over the terms of the insurance transaction, and the presence or absence of collusion by the insurance company was deemed to be irrelevant. Furthermore, the Aetna policies were not owned by Associates or petitioner when they were sold, and their respective incomes were from commissions and other payments by Aetna for services rendered, not from policy premiums, as would be the case for a "seller" of insurance. Unlike a merchant who keeps stock in trade, neither Associates nor petitioner had any inventory of insurance policies which they owned and which were being held for sale. Finally, there is no evidence that Associates or petitioner had the "authority to adjust 'a specified gross price to an agreed net price'", [18] a factor thought to be an important prerequisite *134 to status as a "seller". See Alex v. Commissioner, supra, 70 T.C. at 330 (Wilbur, J., concurring). In short, we conclude that Associates and petitioner were not the sellers of the insurance within the meaning of Alex. Accordingly, their payments of net premiums due do not qualify as reductions of the purchase price of policies or as the cost of policies sold by them. The net premium payments were deductions from gross income subject to section 162(c)(2). Petitioners next argue that the payments of net premiums due were "discounts" and not rebates, and that only rebates are forbidden by Cal. Ins. Code sec. 750 (West 1972). [19] Petitioners point to the absence of any payment or kickback from the agent to the insured, which *135 they characterize as an illegal "rebate". The point is spurious. There is no difference in substance between a case in which the insured pays the premium and then receives a kickback of the premium from the agent's commission, and a case like the instant case, in which the agent pays the premium from his commission directly to the insurance company on behalf of the client without making a transfer of funds to the insured. The net effect in both situations would be the same, i.e., the client would enjoy a reduction in the premium below that stated in the policy. Petitioner's interpretation of the statute as prohibiting only payments of commission kickbacks from the agent directly to the insured would place undue emphasis on the form of the transaction rather than on its substance, and would open the statute to wholesale evasion. In the present context, "discount" is merely a euphemism for rebate. [20]
*136 It is important to note that Associates' and petitioner's insurance licenses were revoked by the California Department of Insurance on the ground that certain of the transactions involved in this case violated Cal. Ins. Code sec. 750.As far as the record shows, the license revocations were not contested beyond the administrative level. We think that the license revocations are persuasive evidence that the transactions here at issue violated section 750 of the Insurance Code. We conclude that the payments of net premiums were unlawful under section 750 of the California Insurance Code, and that they are nondeductible under section 162(c)(2), I.R.C. 1954. [21]
2. Liquidating Dividend. The Commissioner determined that $172,754 of the business expenses paid by Associates between June 19, 1973, and July 28, 1973, during *137 its winding-up period were paid for the benefit of petitioner's sole proprietorship, and that the expenses are not deductible by Associates. He further determined that the payments are taxable to petitioner as additional amounts received in liquidation of Associates. All but $42.50 of the challenged expenses represent payments of net premiums due on clients' policies. Petitioner bears the burden of proving the Commissioner's determination to be erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure. We hold that petitioner has carried his burden of proof in part. The situation in this case is similar to cases involving ongoing corporations which make payments on behalf of shareholders characterized by the Commissioner as taxable "constructive dividends" to the shareholders. See generally 1 Mertens, Law of Federal Income Taxation secs. 9.07-9.08 (1974 rev.). It is well settled that if a corporation expends an amount or makes a payment which does not advance the corporate interest *138 but instead serves the personal interests of the shareholder, the payment may constitute a taxable dividend to the shareholder.See, e.g., Sachs v. Commissioner, 32 T.C. 815, 820 (1959), affd. 277 F. 2d 879 (8th Cir. 1960), cert. denied 364 U.S. 833 (1960), and cases cited therein; 1 Mertens, supra, sec. 9.08 at 23. Our task, therefore, is to determine whether the payments in issue were made in accordance with the corporation's understanding with its clients and in respect of commission income generated basically by its own efforts rather than by those of the successor sole proprietorship. If the payments were thus made in respect of the corporation's business to carry out its part of the bargain during its winding up period, they must be treated as attributable to the corporation and not to petitioner individually. Although the record is not entirely satisfactory in respect of this issue, it is our best judgment on the evidence that payments made between June 19, 1973, and July 11, 1973, must be attributed to the corporation, whereas the remaining $101,302.50 paid by it during the period July 12, - 28, 1973, related to the business *139 of the proprietorship which must be attributed to petitioner as part of the proceeds of Associates' liquidation. Petitioner argues that Associates correctly treated the challenged payments as corporate obligations because they related to clients who agreed to apply for their policies before Associates began to liquidate. Petitioner explains the delay in payment of premiums until after the liquidation was commenced on May 23, 1973, by pointing the the existence of a time lag between the date the client was solicited and the date the premium was paid after acceptance of the client's application by Aetna. However, we think the evidence does not support petitioner's testimony that the time lag was typically as long as 2 to 2-1/2 months between the date of a successful solicitation and the date the premium was paid. The stipulated evidence establishes that on July 12, 1973, petitioner began making payments of net premiums due from his sole proprietorship accounts. Applying a 2 or 2-1/2 month lag to these payments and working backwards, the sole proprietorship business would have had to have been solicited no later than May 12, which was before the May 23 decision to liquidate Associates. *140 Since this proprietorship business could not have been solicited before May 23, and the first premium payments by the proprietorship were made on July 12, the actual time lag must have been at most six or seven weeks. Thus, it seems probable that the June 19 through July 11 payments related to clients who were solicited by the corporation before May 23, whereas the July 12 through July 28 payments related to clients who were solicited no earlier than May 23, presumably by the proprietorship. And it is our best judgment on the record that the earnings in respect of the policies involved in the earlier period were generated basically by corporate efforts, whereas the earnings relating to the policies in the following period were generated by petitioner individually. The Commissioner emphasizes the fact that petitioner deposited into his sole proprietorship account the commissions from the policies for which Associates paid the premiums during the period in question. While this is disturbing, we nevertheless believe petitioner's testimony as to the existence of a time lag (although less than 2 to 2-1/2 months) which explains why Associates paid some of the premium payments after *141 May 23, 1973. We find as a fact that the payments by Associates between June 19 and July 11, 1973, represent payments in respect of corporate clients, [22] and that the payments made on July 12 (the date the first payments were made from the sole proprietorship account) through July 28, 1973, were for the benefit of the sole proprietorship in respect of clients solicited by the proprietorship. Accordingly, we conclude that petitioner received an additional liquidating dividend from Associates in the amount of $101,302.50, and that Associates is not entitled to deduct that amount. [23]
*142 3.Transferee Liability and Related Adjustments. The Commissioner determined that petitioner is liable for the corporate deficiencies and additions to tax as transferee of Associates' assets in the amount of $201,193. Petitioner concedes that he is liable as transferee of Associates, but he disputes the amount of his liability to the extent that it is based upon the $172,754 additional liquidating dividend determined to have been received in respect of the June 19 through July 28, 1973, expense payments by Associates. In a transferee liability case, the Commissioner bears the burden of proof as to the value of the assets transferred. Sec. 6902(a), I.R.C. 1954; Rule 142(d), Tax Court Rules of Practice and Procedure; Bowlin v. Commissioner,31 T.C. 188, 208 (1958), affd. per curiam 273 F.2d 610 (6th Cir. 1960). The affirmative finding of fact previously made in connection with the liquidating dividend issue suffices to establish the amount of corporate assets gratuitously transferred to petitioner by means of the expense payments. *143 Petitioner is liable as transferee to the extent of $129,741.50 (the $28,439.00 liquidating dividend reported by petitioner plus the $101,302.50 amount found to constitute an additional liquidating distribution). Petitioner contends that the transfer from Associates cannot simultaneously form the basis for a taxable liquidating dividend and for transferee liability, and that the amount of the liquidating dividend should be reduced by the amount of transferee liability attributable to the transferred assets. We disagree. Petitioner must report the entire amount of the liquidating dividend in the year received, unreduced by the amount of any transferee liability. Abdalla v. Commissioner,69 T.C. 697, 709 (1978); Schneider v. Commissioner,65 T.C. 18, 30-31 (1975); Pittman v. Commissioner,14 T.C. 449, 451-452 (1950); Estate of Mills v. Commissioner,4 T.C. 820, 827-828 (1945); Schramm v. United States,93 Ct. Cl. 181, 36 F. Supp. 1021 (1941); cf. James Armour, Inc. v. Commissioner,43 T.C. 295, 312 (1964); *144 Meyers v. Commissioner, i 1 T.C. 331, 345-346 (1953). The Commissioner is not estopped from asserting both transferee liability and a liquidating dividend on the same distribution. Cf. Estate of Stein v. Commissioner,37 T.C. 945, 951-954 (1962); Meyers v. Commissioner,supra.Petitioner will be entitled to an appropriate deduction when and if the transferee liability is paid. See Healy v. Commissioner,345 U.S. 274, 284 (1953). Petitioner's reliance upon United States v. Brown,86 F. 2d 798 (6th Cir. 1936), is misplaced, as shown by Estate of Stein,supra,37 T.C. at 952-954, which found that Brown was not controlling in cases of this character, particularly in the light of the Supreme Court's later decision in Healy v. Commissioner,supra.Compare Meyers v. Commissioner,supra, 21 T.C. at 345-346. 4. Negligence Penalty. The Commissioner determined that part of the underpayment of tax by Associates for its first taxable year ending September 30, 1972, was due to negligence, and that Associates is liable for the five percent *145 addition to tax under section 6653(a). The Commissioner's determination was based upon the conceded failure of the corporation to report as income $52,736 of commissions and expense reimbursements from Aetna paid directly to Security Pacific Bank. [24]Petitioner bears the burden of proving that the imposition of the negligence addition to tax is erroneous. Vaira v. Commissioner,444 F. 2d 770, 777 (3rd Cir. 1971), affg. on this issue 52 T.C. 986 (1969); Marcello v. Commissioner,43 T.C. 168, 182 (1964), affd. on this issue 380 F. 2d 499, 505-507 (5th Cir. 1967); Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). We hold that petitioner has not met his burden. *146 The omitted commission income was missed by Associates' accountant because the commission payments from Aetna were never physically received by Associates nor reflected in Associates' bank deposits. The commissions were paid directly to Security Pacific Bank under a procedure initiated by petitioner for automatically repaying business loans from the bank with commission income. Petitioner began using this loan repayment procedure before Associates was incorporated. Petitioner was familiar with the bookkeeping system devised by the accountant for Associates and he knew that gross receipts would be computed primarily by reference to actual cash receipts by the corporation. However, petitioner never advised the accountant of his practice of diverting some of his commissions directly to the bank, and no satisfactory excuse for his failure of disclosure was offered. Furthermore, petitioner did not supply to his accountant, nor did he retain, commission statements from Aetna which might have been used to verify the corporation's books. Finally, Associates failed to report $15,140.20 of commissions paid by Aetna during the calendar year 1971 even though these commissions were reflected *147 on a form 1099 information return from Aetna made out in the name of the corporation. Petitioner did not explain the basis, if any, of his erroneous instruction to the accountant to report the income set forth in Associates' form 1099 as his in-individual income. [25]
The $52,736 of omitted corporate income is not insubstantial when compared to the $21,815 of taxable income reported by Associates for the fiscal year ending September 30, 1972. Under the circumstances of this case, we conclude that there is ample evidence of negligence, and we uphold the section 6653(a) addition to tax. Decision will be entered under Rule 155. Footnotes
1. The petitions in this case allege that the individual petitioner and the corporate transferee overreported their gross receipts by erroneously treating proceeds from certain loans and advances as part of their gross income. Petitioners make no argument in respect of this point on brief, and we conclude that the argument has been abandoned. Furthermore, we have found, infra↩ at 15, that loan proceeds were not in fact reported in the returns as part of gross income, and the point is in any event wholly without merit.
2. Although the parties have stipulated that the agreement was with "Aetna Life & Casualty", the agreement itself (which was incorporated in the stipulation as an exhibit) shows that the agreement was with "Aetna Life Insurance Company". While these may be related, but separate, entities, nothing appears to turn herein upon the difference, and, for convenience, the applicable entity, whichever it may be, will generally hereinafter be referred to simply as "Aetna".↩
3. A non-participating policy is one that pays no policy dividends. ↩
4. However, this new policy, offered only in minimum amounts of $25,000, was available for sale not only by petitioner but also by all of the other Aetna agents and brokers.↩
5. The method of operation was the same regardless of whether petitioner acted individually or through his corporation. For convenience, to avoid repetition in referring to the corporation as well as to petitioner, the findings and opinion will sometimes refer merely to petitioner in describing the details involved.↩
6. The vouchers submitted to Aetna in support of the reimbursement allowance were fictitious, and none of the expenses that were the subject of claims for reimbursement by Aetna were in fact incurred by Associates or petitioner. The fact that such "reimbursements" were based on fictitious vouchers was known and acquiesced in by one or more responsible officers of Aetna.↩
7. The 97 percent figure is obviously based upon the fact that Aetna withheld from the loan proceeds advance interest (computed at the rate of six percent per annum) for the remaining six months of the year.↩
8. The amount actually made avaiable, however, was not the full 80 percent, but rather the 80 percent minus a full year's advance interest on the net amount made available and minus also a full year's advance interest on the unpaid loans theretofore made. Accordingly, unless indicated otherwise, whenever the term cash value available to the insured is used herein (whether 65 percent of the premium in the first year or 80 percent of the premium in any subsequent year), it is intended to refer to the net↩ amount available after taking into account the interest withheld.
9. During December 1973, petitioner paid Aetna the first-year premium in full with respect to certain sales. In those instances he did not obtain a loan from a bank or lending institution for an amount equal to the cash loan value of the policy or execute a reassignment of the cash value as collateral.↩
10. In transactions described in fn. 9, supra↩, the policy cash value was paid directly to Associates or petitioner. 11. For purposes of illustration, the parties have stipulated the details of a typical transaction as follows: "[The] competitive annual premium on Aetna's one million dollar, Guaranteed Cost Life, Paid-up at 95, insurance contract was $25,000.00. Approximately 97% of 65% of the premium, or $15,771.00, representing the available cash value of the policy at six months would be borrowed by Associates or Kreisberg from a bank. The bank discounted the proceeds of the loan at the prevailing rate, about 10% per annum in 1972 and 1973, so that Aetna received only $15,005.00 from the bank. The balance of the annual premium ($9,995.00) was remitted by Associates or Kreisberg. The total commission and expense reimbursement allowance (74.25% of the premium) received by Kreisberg or Associates was $18,562.50.Six months hence, Aetna would remit to the lender $15,771.00 and the lender returned a relinquishment of assignment on the policy. * * * To illustrate the receipts and disbursements from [such] typical sale * * *,     Associates or Kreisberg received $18,563.00 from commission and allowance and $15,005.00 from the lender, a total of $33,568.00. Associates or Kreisberg paid Aetna $25,000.00, leaving a net receipt of $8,568.00 [in the hands of Associates or Kreisberg] on the sale of the policy".↩
12. In general he would receive his 10 percent renewal commission from Aetna two weeks after he had paid the entire amount of the net premium with his own funds. ↩
13. For purposes of illustration, the parties have stipulated that if Associates or petitioner paid the $25,000 renewal premium on the policy referred to in fn. 11, supra↩, the $25,000 would be derived from a loan of available cash value in the amount of $18,838 (80 percent of the premium, less interest on the cash value loans at six percent) and a remittance from Associates or petitioner of $6,162, which included interest paid on the cash value loans [1,162) and the balance of the premium ($5,000). On the renewal, Associates or petitioner received $2,500 commission and $18,838 from accumulated cash value. Associates or Kreisberg paid Aetna $25,000, resulting in a loss of $3,662.
14. Certain of the amounts included in Associates' claimed cost of sales were disallowed for other reasons. Except as hereinafter described, petitioners concede the correctness of those disallowances.↩
15. Of the $172,753.74, the amount of $42.50 has been stipulated to represent payments to physicians. The Commissioner rounded the amount of disbursements made by Associates during the June 19 through July 28 period to $175,754.↩
16. The Commissioner rounded the amount of unreported funds to $52,736 in the deficiency notice.↩
17. SEC. 162. TRADE OR BUSINESS EXPENSES (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * * * *
(c) Illegal Bribes, Kickbacks, and Other Payments.-- * * *
(2) Other Illegal Payments.--No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary or his Delegate to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).↩
18. In fact, the evidence is to the contrary. The Agency Agreements between Associates, petitioner and Aetna granted Associates and petitioner authority only to solicit and submit applications, deliver policies, collect the first premiums and service the business. The Agency Agreements contained "Limitations of Authority" prohibiting the agent from making, altering, modifying or discharging any contract on behalf of Aetna.↩
19. Sec. 750. Rebate of premium An insurer, insurance agent, broker, or solicitor, personally or by any other party, shall not offer or pay, directly or indirectly, as an inducement to insurance on any subjectmatter in this State, any rebate of the Whole or part of the premium payable on an insurance contract, or of the agent's or broker's commission thereon, and such rebate is an unlawful rebate.↩
20. State Compensation Insurance Fund v. McConnell, 46 Cal. 2d 330, 294 P. 2d 440, 447 (1956), is distinguishable. That case involved reductions in premiums by insurers pursuant to the terms of rating plans set forth in the policies. The reductions were held to be not violative of Cal. Ins. Code section 750, because the rating plans provided for discounts, not rebates. Discounts were defined as a method of computing rates. 294 P. 2d at 447. The State Compensation Insurance Fund case did not purport to apply to insurance agents↩ in general, much less to those like petitioner and Associates without authority to set or modify rates specified in the policy.
21. Petitioner makes no claim that he is entitled to deduct the interest paid on the six-month bank loans made in his name to finance the initial premium payments, nor does he claim interest deductions in respect of any of the policy loans which were applied against premiums due. Accordingly, we do not express any opinion on these matters.↩
22. We note that the Commissioner makes no argument that if the clients for whom premiums were paid by the corporation were corporate clients, the commission income paid into the sole proprietorship account should be attributed to the corporation to the extent that the corporation failed to report the income. He also does not contend that the commissions deposited in the sole proprietorship account should be treated as an additional liquidating dividend for the purpose of determining the extent of transferee liability against petitioner. Nor does petitioner ask that any portion of the commissions allegedly reported by him should be included in the corporation's income. We express no opinion on these matters. ↩
23. In light of our previous disposition of the section 162(c)(2)↩ issue, Associates may not deduct the $71,446.24 of premiums that it paid between June 19 and July 11, nor may petitioner deduct as a proprietorship expense the premiums paid on his behalf by Associates.
24. There is some suggestion in petitioners' brief that the negligence penalty was based in part upon the conceded failure of Associates to report $8,000 of "advances" that were taxable income to it. However, the Commissioner does not rely upon or discuss the failure to report these advances in his opening or reply briefs. We therefore conclude that the negligence penalty was not based upon the unreported advances.↩
25. The remaining $37,596.03 of unreported income that was paid by Aetna during the calendar year 1972 was not reported on petitioner's individual return.↩